*In re* NORTH BLOOMFIELD GRAVEL MIN. CO.

WOODRUFF *v.* NORTH BLOOMFIELD GRAVEL MIN. CO. and others.

(*Circuit Court, D. California.* May 9, 1886.)

CONTEMPT—VIOLATION OF INJUNCTION—MINING DEBRIS.

Running a tunnel 2,500 feet into respondent's mine, and washing the earth removed therefrom, and washing the earth from caves of the banks, occurring from time to time, by a hydraulic monitor, and other washings of earth and *debris* by water flowing over the high banks of the mine into a tributary of the Yuba river, is a violation of the injunction perpetually restraining defendants "from discharging or dumping into the Yuba river, or its tributaries, any of the tailings, boulders, cobble-stones, gravel, sand, clay, *debris,* or other refuse matter," from any of their mines; constitutes a violation of the injunction; and a contempt. Punishment: A fine of $1,500 imposed as a punishment for the contempt.

Before SAWYER, J.

## MASTER'S REPORT.

The evidence clearly shows that, since the date of the filing of the decree herein, mining tailings have been discharged into Humbug creek by the respondent the North Bloomfield Gravel Mining Company, from its mine described in the bill. With reference to the character and extent of the mining operations which have been carried on in said mine since the date referred to, it appears from the testimony that in June, 1884, the said respondent commenced the construction of a tunnel along the bed-rock in its mine, for the purpose of drift mining; that drift mining has been there carried on continuously from that time to the present; and that, up to the present time, 2,500 or 3,000 feet of tunnel and drifts, seven feet high, and averaging four and a half feet wide, have been run. The drift tunnel was started in the mine on the channel, at the base of a point or pinnacle projecting into the excavation, from its northerly bank, about 20 or 30 feet; the height of said point or pinnacle at that time being about 150 feet, and its present height being 50 to 100 feet. In the same month (June, 1884) a 22-inch pipe, terminating with a hydraulic monitor, was placed, and has ever since remained, in a position commanding the mouth of the drift tunnel, distant therefrom about 100 to 150 feet eastwards. To the west of the tunnel mouth, at about an equal distance, is the terminal point of a 15-inch pipe, bearing the lower joint or "knuckle" of a monitor. The chief purpose of both of these pipes was to provide streams of water to be used for the protection of the drifting operations. Water driven through the monitor washed away material which caved or was washed down from the banks, and which covered or threatened the mouth of the tunnel. The other pipe mentioned terminated upon the west side of the tunnel mouth, where the banks of the excavation were less liable to injurious caving; and the intention was that, should the caved bank cover the end of this pipe, and the bed-rock in its neighborhood, a stream of water passing through the pipe, and out at the knuckle, would wash away the fallen material. In case of a serious cave of the bank upon that side, a monitor nozzle could readily be adjusted upon the knuckle, and the caved gravel piped away. Water flowing through a branch of the eastern pipe mentioned washed into the outlet tunnel, and into the creek, the material resulting from the drifting operations.

As previously stated, the location of the monitor has not been changed since it was placed in position, about the time the work of drifting commenced; and the material which has been removed from the vicinity of the drift tunnel in the mine is not of great quantity, when compared with that which would have been run off had the monitor been moved from place to place, and kept in constant operation, as in former times. Still, a considerable quantity of mining tailings has undoubtedly been discharged into the creek from respondent's mine since the date of the decree. During the entire period which has elapsed since that date, at least 1,000 miner's inches of water has daily, with the exception of short intermissions for repairs to flumes, been run into and through the mine, either through pipes, or over the banks of the excavation.

The drift tunnel was started near the center of a bend in the northern bank of the excavation; and, when preparations for drifting were commenced, a moraine, composed of material which had fallen from the banks, lay on the bed-rock in the immediate vicinity of the present location of the drift tunnel mouth. The form of the moraine was triangular, its base being about 250 or 300 feet across, and its two sides running up to a point at or near the center of the bend referred to. The slope of the moraine from base to apex was gradual, and its depth varied from nothing at the base to 25 or 30 feet at the apex. A channel through this mass, from five to eight feet in width, was made by water flowing into the mine through the Malakoff ravine, and the

remainder of the moraine has since been washed away. In the bank on each side of the projection in which the mouth of the drift tunnel is located, a chasm or gorge has been washed back two or three hundred feet, its width being two or three feet at the bottom and about one hundred feet at the surface, the banks in that locality being of a height of at least two hundred feet. Some portion of the bank in the vicinity of the drift tunnel mouth has also been washed away. Some portion, however, of the gravel which has caved from the top of the pinnacle which overtops the drift tunnel, and some of the material which has fallen from the banks upon either side, still remains within the excavation, as it fell. The testimony also shows that water has been run over the embankment, and so through the outlet tunnel into Humbug creek, at other places than at those mentioned above.

I therefore find, and do report, that, since June, 1884, the North Bloomfield Gravel Mining Company, respondent, has been continuously engaged in practical drift mining in its mine described in the bill herein; that, in prosecuting, facilitating, and protecting such drift mining operations, said respondent has removed from its said mine, and discharged into Humbug creek, a tributary of the Yuba river named in the decree herein, a considerable quantity of mining tailings; that mining tailings, in much less quantity, have also been by said respondent discharged from its said mine into said creek, by means of water run from ditches over the banks of said mine; and that thereby said respondent has violated the decretal order of this court, and is in contempt.

Respectfully submitted,                    S. C. HOUGHTON, Master.

*A. L. Rhodes* and *A. L. Hart,* for complainant.

*Stewart & Herrin,* for respondent.

SAWYER, J. The master reports that, since the entry of the decree, "mining tailings have been discharged into Humbug creek by the respondent, * * * from its mines described in the bill." After stating that respondent had run some 2,500 to 3,000 feet of tunnel for drift mining, and carried on drift mining continuously from June, 1884, washing the *debris* arising from such mining, and from caves of the bank occurring from time to time, washed away by monitors properly located for the purpose, into the creek wherein the *debris* had theretofore been discharged, and giving particulars of the operations of respondent, he concludes:

"I therefore find and report that since June, 1884, the North Bloomfield Gravel Mining Company, respondent, has been continuously engaged in practical drift mining in its mine described herein; that in prosecuting, facilitating, and protecting such drift mining operations, said respondent has removed from said mine, and discharged into Humbug creek, a tributary of the Yuba river named in the decree herein, a considerable quantity of mining tailings; that mining tailings, in much less quantity, have also been discharged from its said mine into said creek, by means of water run from ditches over the banks of said mine; and that thereby said respondent has violated the decretal order of this court, and is in contempt."

No exceptions to the master's report were filed by respondent, and there was no good ground for exception; but the complainant filed several exceptions upon the ground that upon various points the findings are not so strongly put against said respondent as the testimony requires, and on the ground that he did not find that the violation of the injunction was willful. The testimony upon which the findings

are based was reported in full, in pursuance of the order. After a careful examination of the evidence, I am satisfied that the master has made an intelligent, fair, and impartial report; but it is certainly fully as favorable to the respondent as it was entitled to expect, and is sufficient, without modification, in the light of the testimony, to enable the court to make a proper disposition of the question of contempt.

The respondent insists that the mining done being "drift mining," as its counsel term it, and the hydraulic washing performed by means of the monitor being such as was incident to the drift mining, and was necessary to the protection and successful carrying on of drift mining, there was no violation of the injunction. It is insisted that this drift mining, and its incidents, are not within the terms of the decree; or, if otherwise, that the decree is broader than is justified by the allegations of the bill, and to that extent should not be enforced. I cannot assent to this view. It is true that the bill describes the operations carried on by respondent by means of which the *debris* is thrown into the streams, as hydraulic mining. But this is only a means by which the *debris* which works the mischief is discharged into and deposited in the stream, and sent on its destructive course. The thing sought to be restrained is not hydraulic mining,—merely the means by which the *debris* is discharged into the stream. It is not sought to restrain hydraulic mining in itself, or as an occupation, but only so far as it is a means of injury.

The complaint is that the *debris* is discharged into and deposited in the streams, to complainant's injury; that "with full knowledge of the irreparable damage to your orator caused, and to be caused, by the aforesaid use of the channels of the foregoing described streams, as a place of deposit and wastage of the tailings of these said mines, * * * they make the announcement of their intention to continue to use the channels of the Yuba river, and its tributaries, aforesaid, as a place of deposit for their tailings from their aforesaid mining claims," etc.; and that they "claim a common right to deposit the tailings and *debris* from their several mines in the Yuba river and its tributaries," etc. The prayer of the bill is for an injunction, not against hydraulic mining merely, but "enjoining them, and each of them, from discharging or dumping into the Yuba river, or any of its forks or tributary streams, or into Deer creek, any of the tailings, boulders, cobble-stones, gravel, sand, clay, *débris*, or refuse matter, from any of their said tracts of mineral lands or mines; and also from causing or suffering to flow into said creeks, or tributary streams aforesaid, any tailings, boulders, cobble-stones, gravel, sand, clay, or refuse matter therefrom," etc., and the decree conforms to the prayer, and provides that the said defendants, "and their and each and all of their servants, agents, and employes, are perpetually enjoined and restrained," not from hydraulic mining, but "from discharging or dumping into the Yuba river, or into any of its forks or branches, or

into any stream or tributary to said river, or any of its forks or branches, and especially into Deer Creek, Sucker Flat ravine, Humbug creek, Scotchman's creek, any of the tailings, boulders, cobblestones, gravel, sand, clay, *debris*, or refuse matter from any of the tracts of mineral land or mines described in the complaint; and also from causing or suffering to flow into said rivers, creeks, or tributary streams aforesaid, therefrom, any of the tailings, boulders, cobblestones, gravel, sand, clay, or refuse matter resulting or arising from mining thereon." If respondent can work their mines by the hydraulic process or otherwise, without discharging their refuse matter into the streams, they are at full liberty to do so.

This language was carefully considered when the terms of the decree were settled, and I do not think it broader or more comprehensive than either the prayer or the allegations in the body of the bill justified. It can make no difference whether the refuse matter is thrown into the streams by what is strictly called hydraulic mining or drift mining. This can only be a question of degree in the injury resulting. The acts found by the master are clearly within the terms of the decree and the acts complained of. Indeed, if the decree could be limited, as to *debris* thrown into these streams, to hydraulic *mining* alone, I think the acts reported by the master, and, especially, as shown by the testimony taken, constitute "hydraulic mining," within the proper meaning of the term as used in the bill. There was, certainly, considerable "hydraulic mining" within the narrowest meaning of the term.

There is, in my judgment, no matter of estoppel in the observations of counsel made during the progress of the trial. Until reversed, the rights of the parties are settled by the decree and the pleadings upon which it is founded. There is no evidence of the complainant's having assented to, or having induced, any violation of the injunction since the entry of the decree. The respondent, therefore, must be adjudged to be in contempt.

It only remains to determine the punishment that should be inflicted for the contempt adjudged. As this is the first occasion in this court of the kind, and the defendant disclaims any intent to disregard the decree of the court, and its officers profess to believe that mining in the mode pursued by them, which they call "drift mining," would not be a violation of the injunction, and considering the observations of complainant's counsel at the trial, I shall not be severe, in view of the immense interests affected, and the amount of the proceeds of the mine resulting from the violation of the injunction. Considering the amount of work performed, which although far below what had formerly been accomplished, the amount of *debris* discharged into the streams was by no means inconsiderable. The decree in this case is either right or wrong. If right, there can, properly, be no temporizing or compromise by allowing some wrong to be done. The wrongful acts of filling the streams with the *debris*, to the injury

of parties below, by whatever means accomplished, must be wholly stopped, in all cases, or the rights of the injured parties cannot be efficiently protected. Having no doubt, myself, of the propriety of the decree, in all its parts, it is my imperative duty to hereafter enforce it, if necessary, by all the sanctions afforded by the law. If wrong, it can readily be corrected on appeal. Let judgment for a fine of $1,500 be entered, with costs. As a compensation, in part, for the large expenses that must have been incurred in procuring evidence and prosecuting this proceeding for contempt, the money, when collected, will be paid over to complainant or his solicitors.

Let judgment be entered accordingly.