## INDIANAPOLIS WATER CO. v. AMERICAN STRAWBOARD CO.

(Circuit Court, D. Indiana. September 15, 1896.)

No. 8,719.

1. CONTEMPT OF COURT—CONTEMPTS CLASSIFIED.
    Contempts, broadly considered, are of two kinds,—direct and constructive. Contempts committed in the presence of the court, sitting judicially,

or so near as to interfere with the orderly course of procedure, are direct contempts. Contempts committed, not in presence of the court, but which tend by their operation to interrupt, obstruct, embarrass, or prevent the due and orderly administration of justice, are constructive contempts.

2. SAME—CONSTRUCTIVE CONTEMPTS.

Constructive contempts are of two general classes: First, those wherein the contemptuous acts primarily affect public rights or the due administration of public justice; second, those which primarily affect private rights, and only remotely and incidentally affect public rights or public justice. When contempt proceedings are prosecuted to vindicate a public right, they are criminal offenses, in which the intent is a material and necessary ingredient. When they are prosecuted, either solely or primarily, to enforce and vindicate private rights, which have been secured from violation by an interlocutory or final decree of the court, they are not criminal, but civil, and remedial in their nature, and are punishable without regard to the motive of defendant.

3. SAME—VIOLATION OF INJUNCTION.

Where defendant was enjoined, at the suit of a water company, from allowing any deleterious substances to escape from its factory into the river, and thereupon built a reservoir on the bank of the river, which it negligently and carelessly permitted to break and discharge its contents, *held*, that this was a contempt punishable by fine, or by fine and imprisonment, although there was no willful purpose to violate the injunction.

This was a petition by the Indianapolis Water Company against the American Strawboard Company for a rule to show cause why defendant should not be punished as for a contempt, for violating an injunction.

Baker & Daniels and Addison C. Harris, for petitioner.

John W. Kern and S. S. Wheeler, for respondent.

BAKER, District Judge. The complainant, the Indianapolis Water Company, obtained a final decree in this court (57 Fed. 1000) against the defendant, the American Strawboard Company, "perpetually enjoining the American Strawboard Company, and its officers, agents, servants, and employés, from and after the 1st day of December, 1893, from passing, flowing, discharging, casting, or permitting to pass, flow, or be discharged or cast, or to escape into the White river, any decomposable or deleterious matter or refuse or offal from the defendant's said strawboard factory." A copy of this decree was duly served on C. D. Macy, the general superintendent and manager of the strawboard company, at Noblesville, Ind. A petition was filed by the complainant, and a rule was entered requiring the defendant and its general manager to show cause, if any they had, why they should not be punished for violating this injunction. A hearing has been had, and a large number of witnesses were sworn and examined touching the matter of the alleged contempt. It was shown that shortly after the entry of the decree the defendant constructed a large reservoir or basin, of about 43 acres in extent, immediately upon the east bank of White river, and adjoining its premises on the south. The reservoir or basin was constructed by building an embankment several feet in height, composed of the earth taken from the ground at that place. The embankment was in no wise supported or strengthened by masonry, or otherwise protected. The bank of the river at the point

where the reservoir was built is several feet above the level of the water in the stream. After building the reservoir the defendant opened a way from its mill whereby all the offal and refuse matter flowing therefrom was discharged into the reservoir. The daily discharge from the mill is about 3,000,000 gallons, carrying deleterious and poisonous matter held in solution, and also large quantities of rotten straw and refuse, and other obnoxious matter held and carried in suspension. The daily consumption of the mill is from 50 to 60 tons of straw, of which at least one-fourth is carried away as refuse. Large quantities of lime are daily carried from the mill, along with the other refuse. The straw used in the mill is subjected to boiling for a long time in lime water, and with hot steam, so that the soluble properties of the straw are extracted, and carried away in solution. The matter carried in suspension, and particularly that held in solution, when exposed to light, heat, and air, becomes, under the operation of natural laws, poisonous and destructive to all animal life. All of these facts were well known to the defendant, and to its general manager, before the reservoir was built. It was further shown that the defendant and its officers knew that the complainant was charged with the duty, under contract with the city of Indianapolis, of supplying water for domestic uses to the citizens thereof, and that it was compelled to and did take water from the river, and pass the same into its mains, and furnish it, for general use, to the people. The defendant and its general manager, after the construction of the reservoir, began and continued to discharge therein the large quantity of deleterious refuse before mentioned, until the same became filled to within 12 to 18 inches of the top of the embankment. About a week or 10 days before the bursting of the embankment, and the discharge of the contents of the reservoir into White river, a small break occurred at the point where the last break happened. This small break was discovered before serious damage occurred, and it was filled in with surface soil and gravel. The defendants kept no one to watch the embankment and guard it from injury arising from accident or design, or from the pressure of the impounded waters. They were careless and negligent in failing to exercise such care and use such means as might and would have prevented the breaking of the reservoir, and the discharge of its contents into the river. The accident might have been prevented by the use of that high degree of care which was incumbent upon them under the circumstances. The injury resulting from the breach of the reservoir was of a serious and lasting character. About 10 tons of fish, and nearly all of the animal life in the river, were destroyed. The polluted and poisonous water was taken into the mains of the complainant, whereby for some time the water was rendered unfit for domestic purposes, and increased sickness among the people was attributed to its use.

The evidence does not satisfy the court that either the defendant or its general manager intentionally and purposely violated the injunction. However, with full knowledge of the noxious character of the refuse discharged from the mill, they purposely constructed

the reservoir on the bank of the river, and emptied into it daily 3,000,000 gallons of deleterious refuse, for their own convenience and profit. They did this knowing the hazard of their undertaking, and the injury which must inevitably follow if the embankment gave way, and the contents of the reservoir were emptied into the river. They were creating and storing this poisonous refuse for private gain, and they were enjoined by the decree of the court not to suffer or permit it to escape into the river. Negligently, but not willfully, they did suffer and permit it so to escape.

It is insisted by counsel that the defendants cannot be punished, because contempt of court is a specific criminal offense, and it is not shown that the injunction was willfully and intentionally violated by them. It is also said that the court possesses no rightful authority to punish the violation of a restraining order, when its violation is the result of mere careless and negligent conduct, unmixed with a contemptuous or criminal purpose. Broadly considered, contempts have been classified as "direct" and "constructive." Those which are committed within the presence of the court, while sitting judicially, or so near to the court as to interfere with or interrupt its orderly course of procedure, are direct contempts; and such contempts are usually punished in a summary manner, without evidence, upon view and personal knowledge of the presiding judge.    Whittem v. State, 36 Ind. 196; Ex parte Wright, 65 Ind. 504; People v. Wilson, 64 Ill. 195.    Contempts are constructive when they are committed not in the presence of the court, and tend by their operation to interrupt, obstruct, embarrass, or prevent the due and orderly administration of justice.    Constructive contempts may be distributed into two general classes, namely: First, those wherein the contemptuous acts primarily affect public rights or the due administration of public justice; and, second, those which primarily affect private rights, and only remotely and incidentally affect public rights or public justice.    When the contempt consists in the failure or refusal of the party to do or refrain from doing something which he is ordered to do or refrain from doing for the benefit or advantage of the opposite party, the proceeding is not criminal, but is civil, and remedial in its nature.    And in this sort of contempt the intention with which the act was committed is immaterial, except in fixing the proper measure of punishment. The injury suffered by the complaining party is neither increased nor diminished, nor in any wise affected, by the state of mind towards the court of the party doing the forbidden act.    The breach of the injunction consists in doing or failing to do the thing commanded, and not in the intention with which the act was done. This result would seem to follow necessarily from the foregoing classification of these proceedings, as well as from a consideration of the rights for whose vindication they are invoked; and this principle seems to be well supported by authority.    Refrigerating Co. v. Gillett, 30 Fed. 683; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 746; People v. Court of Oyer & Terminer, 101 N. Y. 245, 4 N. E. 259; Thompson v. Railroad Co. (N. J. Ch.) 21 Atl. 182; Railroad Co. v. Thompson (N. J. Err. & App.) 24 Atl. 544; Reed

·v. Railroad Co. (N. J. ·Ch.) Id. 922; In re North Bloomfield Gravel Min. Co., 27 Fed. 795; Atlantic Giant-Powder Co. v. Dittmar Powder-Manuf'g Co., 9 Fed. 316; Plate Co. v. Schimmel, 59 Mich. 524, 26 N. W. 692; Spokes v. Banbury Board of Health, L. R. 1 Eq. 42, same case on appeal, 11 Jur. (N. S.) 1011. In the case of Spokes v. Banbury Board of Health, supra, the defendants had been enjoined from permitting sewage to pass into the river Cherwell, to the injury of the plaintiff's mill, and a rule was entered requiring them to show cause why a writ of sequestration should not be ·awarded against them. The answer was that the defendants had found it almost impossible to obey the injunction literally, and that they had been trying to find means of rendering the sewage inoffensive, and that they had no purpose or intention to disregard the order of the court, or to treat it with contempt. Vice Chancellor William Page Wood (afterwards Lord Chancellor Hatherly) refused to entertain this defense, and held the intent of the defendants immaterial, and ordered the writ to issue. Among other things, he said:

"I do not suppose they had any (and I certainly hope they had not any) intention of committing a willful breach of the order of the court, although I was not a little surprised to hear an eminent counsel tell me, .not precisely that he would advise his clients to commit a willful breach, but that he would not advise them to do what was necessary to comply with the order of the court. I confess I was surprised to hear that, and I think it due to the dignity of the court to say that that is not the view which the court can take of its orders, but that the simple and only view is that an order must be obeyed, and that those who wish to get rid of that order must do so by the proper course,—an appeal. So long as it exists, the order must be obeyed, and obeyed to the letter; and any one who does not obey it to the letter is guilty of committing a willful breach of it, unless there be some misapprehension, which all mankind are subject to, and which may mislead him upon the plain reading of the order."

On appeal the action of the vice chancellor was affirmed by Lord ·Justices Knight-Bruce and Turner. In delivering judgment, Lord Justice Knight-Bruce said that the writ was a matter of course, due to the plaintiff by the law of the land, as the means of enforcing the order. And Lord Justice Turner said:

"The defendants say that there has been no willful breach of the order. But I do not ascribe to them any willful intention of disobeying the injunc- · tion. Indeed, their.action shows that there has been no purposed intention of defeating the decree of the court."

In the case of Railroad Co. v. Thompson, supra, William M. Bannard, superintendent of the road, had been fined for contempt for violating an injunction forbidding the distribution and placing of cars ·in front of or near the dwelling house of the complainant, · Thompson. On appeal the action of the court below was held er- ·roneous, because it ·appeared that he had in good faith exercised the authority with which he was clothed, with an intention and purpose, to the best of his ability, to enforce obedience to the order of the court. The opinion of the court was delivered by Van Syckel, J., who said:

"I agree with the learned vice chancellor that if A. be ordered to pay a sum of money, and, being able' to do so,' fails to make the payment, it is immaterial ,what motive prompted the failure, or whether he intended any disrespect of

the court. So, also, if A. be enjoined from so using a dam on his own land as to flood B.'s land, and by his failure to observe the injunction the land of B. is flooded. In such case it is not a compliance with the order by A. to say, 'I will do what I can to protect the land of B.' A. is bound to obey the order of the court. The injury would be averted by the taking down of the dam, which is within his power, and if he cannot avert the harm in any other way the court will listen to no excuse for his default. That is the principle established by the cases cited in the opinion of the vice chancellor."

It was further said:

"The question is whether he exercised the authority with which he was clothed by the company in good faith, with an intention and purpose, to the best of his ability, to enforce obedience to the mandate of the court. Any appearance of evasion on his part, or failure to do what might reasonably be required of him, would be fatal to his claim to relief."

In the case of Plate Co. v. Schimmel, supra, it is said:

"They were bound to obey the injunction, and they disobeyed it at their peril. Neither belief, motive, nor intent with which the writ is disobeyed in any manner varies the responsibility of the party who violates it. On the contrary, they are liable for its violation, in whatever capacity, or from whatever motives, they may have acted." People v. Sturtevant, 9 N. Y. 263; Richards v. West, 3 N. J. Eq. 456; People v. Spalding, 2 Paige, 326; Bank v. Waters, 10 Smedes & M. 559; Monroe v. Harkness, 1 Cranch, C. C. 157, Fed. Cas. No. 9,715; Mead v. Norris, 21 Wis. 310; Quackenbush v. Van Riper, 3 N. J. Eq. 350; Romeyn v. Caplis, 17 Mich. 449.

Counsel for defendants insist that whatever may be the doctrine of the English courts, and of the courts of the several states of the Union, it is settled by decisions of the supreme court that a proceeding whose object is the punishment of a party for the violation of an injunction is a criminal proceeding. In support of this doctrine, New Orleans v. Steamship Co., 20 Wall. 387; Ex parte Kearney, 7 Wheat. 39; Ex parte Robinson, 19 Wall. 505,—among others, are cited, and the following statement from the first of these cases is quoted:

"Contempt of court is a specific criminal offense. The imposition of a fine was a judgment in a criminal case. That part of the decree is as distinct from the residue as if it were a judgment on an indictment for perjury committed in a deposition read at the hearing."

A comparison of these decisions with later ones by the same court will show that the principle contended for is inapplicable to the present case. The case of Ex parte Kearney, supra, was an application to the supreme court for a writ of habeas corpus, where a person was imprisoned by the circuit court for the District of Columbia for a contempt in refusing, as a witness, to answer a question on the trial of an indictment. The application was denied on the ground that the contempt was a criminal offense, and that the court had no appellate jurisdiction in such cases. The case of New Orleans v. Steamship Co., supra, was one where, in a suit in equity, a circuit court of the United States imposed a fine on a defendant for obtaining, during the pendency of the suit, from a state court, an injunction against the plaintiff as to a matter within the scope of the litigation pending in the federal court. It was said that the proceeding in the state court was unnecessary, unwarranted in law, and grossly disrespectful to the circuit court. The court held that

the contempt proceedings were for a criminal offense, and that it had no appellate jurisdiction, for that reason. The case of Ex parte Robinson, supra, was a petition for a mandamus to the judge of the district court for the Western district of Arkansas to show cause why he should not be required to vacate an order disbarring the petitioner as an attorney, which disbarment had been adjudged as a punishment for a contempt of court committed in its presence, while sitting judicially. The court held that the contempt was a criminal offense, but the writ was awarded, nevertheless, on the ground that the punishment was unauthorized, and hence the order of disbarment void. In all of these cases the contempts affected the due and orderly administration of justice, and were offenses against public right, which was sought to be vindicated by their punishment. The primary purpose of the proceedings was to punish offenses against the public, represented by its courts. No private interests were directly affected or assailed by these contempts. The later case of Worden v. Searls, 121 U. S. 14, 7 Sup. Ct. 814, was a suit in equity on a patent, in which, a preliminary injunction having been granted and violated, the circuit court, in proceedings and by two orders entitled in the suit, found the defendants guilty of contempt, and by one order directed that they pay to the plaintiff $250 "as a fine for said violation," and the costs of the proceeding, and stand committed till payment; and by the other order directed that the defendants pay a fine of $1,182 to the clerk, to be paid over by him to the plaintiff, "for damages and costs," and stand committed till payment,—the $1,182 being made up of $682 profits made by the infringement, and $500 expenses of the plaintiff in the contempt proceeding. On appeal it was insisted that the supreme court could not review the action of the circuit court in punishing a contempt committed by a violation of the injunction: (1) Because the proceedings were criminal in their character; (2) because the action of the circuit court is, by section 725 of the Revised Statutes, expressly made discretionary. Both of these contentions were rejected, and the jurisdiction of the court was asserted on the ground that the fines were incidents of the plaintiff's suit, and his right to them was founded on his right to the injunction. And it was further held that the action of the court was not discretionary, in such a sense as to make its order unreviewable. Section 725 of the Revised Statutes of the United States declares that the courts of the United States shall have power to punish, by fine or imprisonment, for contempts of their authority. And among the cases specially enumerated are:

"Disobedience or resistance by any officer of the court, or by any party, juror, witness or other person, to any lawful writ, process, order, rule, decree, or command of said courts."

Such has always been the power of the courts, both at common law and in equity; and as was said in Re Chiles, 22 Wall. 157, 168:

"The exercise of this power has a twofold aspect, namely: First, the proper punishment of the guilty party for his disrespect to the court, or its order; and, second, to compel his performance of some act or duty required of him by the court, which he refuses to perform. Stimpson v. Putnam, 41 Vt. 238.

In the former case, the court must judge for itself the nature and extent of the punishment, with reference to the gravity of the offense. In the latter case, the party refusing to obey should be fined and imprisoned until he performs the act required of him, or shows that it is not in his power to do it."

The doctrine deducible from the former class of cases is that, when the contempt proceedings are prosecuted to vindicate a public right, they are criminal offenses, in which the intent is a material and necessary ingredient. Where, however, the proceedings are prosecuted either solely or primarily to enforce and vindicate private rights, which have been secured from violation by an interlocutory or final decree of the court, they are not criminal, but are civil, and remedial in their nature. As was said by Lord Justice Knight-Bruce in Spokes v. Banbury Board of Health, supra, where the breach of the injunction affects private rights the remedy by proceedings for contempt is a matter of course, due to the complainant by the law of the land, as the means of enforcing the order. It is quite plain that the complainant cannot be protected, except by the defendant preventing the escape of the refuse of its factory into the river. It has created the evil. It did not exist until it began to operate its works. It has accumulated these deleterious substances upon the bank of the river for its private gain, and through its negligence and want of care it has suffered them to escape into the river. It cannot excuse the breach of the injunction by showing that its negligence, and not its willfulness, caused the violation of the order. It undertook the experiment of preventing the escape of the refuse by building a reservoir, which, owing to its want of care, has proved insufficient. It has no right to experiment with the order of the court. Implicit obedience to its order is required, and proof of negligence will not excuse its breach.

The remaining question is as to the remedy to be awarded to the complainant. Where the contempt consists in violating an injunction granted for the protection of the property rights of the complainant, it is said by the supreme court (In re Chiles, 22 Wall. 157, 158) that the proper punishment is fine or imprisonment until the offending party performs the act required of him, or shows that it is incapable of performance. The only way in which the defendant could, with absolute certainty, keep the refuse of its mill from escaping into the river, would be by ceasing to operate the same. The circumstances here do not seem to me, at this time, to require the infliction of a punishment which would stop the operation of the mill. It is said to be the duty of the court, and within its power, and in accordance with its practice, to commit the offending party to the custody of the marshal until such offending party shall compensate the injured party for the damage sustained by the breach of the injunction. In my judgment, the court has the power to commit the offending party until he shall make compensation to the injured party, in a case where the damages caused by a breach of the injunction are capable of liquidation according to the practice of the court. In the present case, however, the damages are unliquidated, and difficult of ascertainment, and ought not to be settled except by the intervention of a jury. I must therefore de-

cline to ascertain them in this proceeding. It may be that the court would have the power to require the defendant to give security for the payment of damages to be ascertained by the verdict of a jury. But this case does not seem to call for the exercise of any such power, as the defendant and its general manager are amply able to respond in damages for any injury suffered by the complainant. The breach of the injunction arose from the negligence, and not from the willfulness, of the defendant and its officers; and it was not known by them that, by negligently suffering or permitting the refuse of the mill to escape into the river, they would be regarded as in contempt for violating the injunction heretofore granted. In view of these facts, it seems to me that the court ought to impose a moderate fine only. As the complainant was fully justified in moving against the defendant and its general manager, it is entitled to costs, with a moderate allowance for its solicitors' fees. Dias v. Merle, 2 Paige, 494.

An order may be prepared, adjudging the American Strawboard Company and C. D. Macy, its general manager, guilty of contempt in disobeying the injunction heretofore granted, and assessing a fine against them of $250, to be paid to the clerk of the court for the use of the complainant, together with the costs of this proceeding, to be taxed.