UNITED STATES of America,
Plaintiff-Appellee,

v.

Curtis LOWERY, Defendant.

Appeal of Gerald M. WERKSMAN.

UNITED STATES of America,
Plaintiff-Appellee,

v.

William GUIDE, Defendant.

Appeal of Jo-Anne F. WOLFSON.

Nos. 82–1777, 82–1860.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1984.

Decided April 24, 1984.

Rehearing and Rehearing En Banc
Denied May 29, 1984.

Robert S. Bailey, Chicago, Ill., for appellants.

Thomas J. Scorza, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and REYNOLDS, Chief District Judge.*

POSNER, Circuit Judge.

Gerald Werksman and Jo-Anne Wolfson, each of whom represented one of the defendants in a protracted criminal trial of 10 Chicago policemen accused of having protected drug dealers in the Marquette district of Chicago, appeal from judgments of criminal contempt summarily meted out to them during the trial by the district judge for alleged misconduct in cross-examining witnesses. The judge fined Werksman $500 for his contempt, and Wolfson $300 for hers. We are asked to decide whether the two lawyers' conduct was contemptuous within the meaning of 18 U.S.C. § 401 and if so whether the summary contempt procedure employed by the judge under the authority of Rule 42(a) of the Federal Rules of Criminal Procedure was appropriate to deal with that conduct.

A witness for the prosecution testified that one Goose had been selling heroin at a street corner, from his hand, when Lowery (Werksman's client) "jumped up from behind a picket fence and grabbed him." To the question, "What happened then?," the witness replied, "They kidded around and laughed," and that Goose had not been arrested. On cross-examination Werksman told the witness, "I don't want to ask you about the law of arrest or the law of search or seizure, but I want to ask you whether Officer Lowery, to your knowledge, knew what Goose had in his hand until he jumped up from behind the picket fence and grabbed him." Werksman was trying to show that Lowery had not had probable cause to arrest Goose when he grabbed him. That would have made the grabbing an unlawful arrest, in which event the fruit

* Hon. John W. Reynolds of the Eastern District of Wisconsin, sitting by designation.

of it—the heroin in Goose's hand—could not have been used in evidence against Goose, Goose could not have been convicted, and Lowery therefore would not have been protecting Goose by failing to arrest him. The witness replied that it had been "quite obvious" what Goose had in his hand. After persisting unsuccessfully in this inquiry for a few more questions, Werksman asked, "Have you ever had any courses on arrest or search and seizure?" Before the witness could answer, the judge interposed, "That question is stricken." Werksman had no more questions and the witness was excused. The judge then summoned Werksman to the bench, where out of the hearing of the jury he told him: "Mr. Werksman, your last question, taken together with the disclaimer, so-called [a reference to Werksman's having said 'I don't want to ask you about the law of arrest or the law of search and seizure'], expressed in a question or two prior to that, will cost you $500, payable to the clerk of the court by the close of business on the following day."

The judge issued an opinion the next day, explaining in detail the basis for the order. He pointed out that, "Early in the case, various defense counsel began an effort to insinuate to the jury that, unless a person had actual physical possession of the narcotics, he could neither be validly arrested nor convicted. The attempt was made by asking the drug peddler witnesses, on cross-examination, questions like 'You knew, didn't you, that if you did not have the narcotics on your person you couldn't be arrested or convicted?' " These questions were improper, both because they asked for legal conclusions and because they falsely implied that having drugs on one's person is a prerequisite to arrest and conviction for a drug offense. Objections to such questions were made and consistently sustained but the lawyers kept asking them, even after the judge ordered the lawyers to stop. It was against this background that Werksman had committed the contempt for which the judge had punished him. By disclaiming any intention of asking the witness about the law of search and

seizure, and then a few questions later asking him whether he had ever taken any courses in that law, Werksman insinuated to the jury that a drug dealer could not be arrested unless the arresting officer knew beforehand that the dealer had narcotics on his person. The court explained: "The offending questions asked by Mr. Werksman were actually statements by him," made "in deliberate, calculated disregard of the court's repeated rulings and admonitions. The statements were made in a loud and sarcastic tone of voice, apparently intended to convey to the jury his open defiance of the court's rulings and his invitation to the jurors to be guided by his view of the law rather than the law as announced by the court." The court found that "no measure short of a contempt citation and imposition of a sanction will be effective to deter the contemptuous conduct of Mr. Werksman. Repeated warnings and admonitions were of no avail." With regard to the need for proceeding summarily, the judge explained that "unless it [i.e., the court] does deter the misconduct of Mr. Werksman, the trial of this long and difficult case, which is in its sixth week and is expected to last at least another month, will become unmanageable, since Mr. Werksman can be expected to continue in his defiance as long as no sanctions are imposed." The judge refused to stay the payment of the fine pending appeal: "Delay of payment would dilute the effect of the punishment, and the full effect is urgently needed at this time." The judge added that in his six years on the bench he had never before found it necessary to hold a lawyer in contempt for conduct in the courtroom.

The incident concerning lawyer Wolfson occurred two weeks later. Again the contempt was adjudged in a side-bar conference without elaboration of the grounds for the contempt, and the judge issued a formal order a few days later explaining that he had warned Wolfson several times about asking questions on cross-examination designed to insinuate to the jury the existence of facts not within the witness's knowledge. The background to the con-

tempt was as follows. Several of the defendants, including Wolfson's client, owned, on the side, a "clock shop" that sold clocks and other merchandise. There was evidence that the drug dealers whom the defendants were accused of protecting made frequent purchases from the shop at grossly inflated prices that could only be bribes for the protection that the policemen were providing to these dealers. During Wolfson's cross-examination of an FBI agent who on direct examination had identified certain photographs and sales records relating to the clock shop's sales to drug dealers, the following exchange took place:

BY MS. WOLFSON:

Q Is it your experience as an FBI agent that it is a crime for somebody who is engaged in selling merchandise to sell to a person whose activities are illegal?

THE COURT: Well, I think that calls for a legal conclusion.

MS. WOLFSON: Well, it is an FBI agent. It is a good person to ask.

THE COURT: The answer to which is no.

BY MS. WOLFSON:

Q Do you know of any United States statute that you are sworn to enforce that makes it a crime—

THE COURT: Sustained.

BY MS. WOLFSON:

Q —for a commercial enterprise to sell to a crook?

THE COURT: Ms. Wolfson, I sustained the very objection to that very question.

I want to see counsel at the side bar.

The judge then held her in contempt. In his written order he explained that "The contemptuous conduct of Ms. Wolfson consisted of asking an obviously improper question, arguing impertinently with the ruling of the court and then proceeding to ask the same question again in defiance of another ruling of the court." The questions she asked of the FBI agent were not intended to elicit facts; they were purely rhetorical; she was trying to use the witness as her mouthpiece to impress on the jury that the defendants were not guilty of a crime in selling merchandise to drug deal-

ers. This was "intentional and willful. It was a repetition of the same kind of conduct about which the court had repeatedly admonished her. It is clear to the court that unless disciplinary action is taken against Ms. Wolfson, she will continue to defy the rulings of the court."

█ There is no doubt that the two contempt judgments were criminal; and they were proper therefore only if they were authorized by section 401 of the Criminal Code. Section 401(1) authorizes punishment for contempt consisting of "Misbehavior of any person in [the court's] presence or so near thereto as to obstruct the administration of justice ...." Section 401(3) authorizes punishment for contempt consisting of "Disobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command." The government argues that the contempt judgments can be upheld under either section; the judge did not indicate under which section (or sections) he was proceeding.

The appellants argue that the only misbehavior in the presence of the court that can be punished as contempt is misbehavior that actually obstructs the administration of justice. But, at least linguistically, the reference in the statute to obstructing the administration of justice qualifies only the liability of one who commits a contempt outside of the presence of the court though "so near thereto as to obstruct the administration of justice"; "so" goes with "as." Read to allow the court to punish "misbehavior of any person in its presence ... as to obstruct the administration of justice," the statute is hopelessly ungrammatical.

There would be no ambiguity if the draftsmen had placed a comma after "presence" and before "or so near thereto ...." But, as a matter of fact, the original statute did have a comma there, Act of March 3, 1911, ch. 231, § 268, 36 Stat. 1163, 28 U.S.C. § 385 (1940 ed.), as did the judicial formulation from which the statute seems to have been derived. See *Indianapolis Water Co. v. American Strawboard Co.*, 75 Fed. 972, 975 (C.C.D.Ind.1896) ("...

committed within the presence of the court, while sitting judicially, or so near to the court as to interfere with or interrupt its orderly course of procedure ...."). The comma was dropped when the contempt provision of section 385 was moved to Title 18 and codified as 18 U.S.C. § 401, but the Reviser's Note makes clear that no substantive change was intended.

A reading that confines the requirement of proving an obstruction of the administration of justice to contempts committed outside of the judge's presence has more than history and grammar to commend it. As federal judges do not enjoy a roving commission to punish as contempts misbehavior occurring anywhere, the words "so near thereto as to obstruct the administration of justice" place appropriate limits on what would otherwise be a quite remarkable power; these limits are less necessary where the misbehavior occurs in the judge's presence.

Nevertheless, the Supreme Court, in *In re McConnell*, 370 U.S. 230, 234, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962), assumed that section 401(1) requires proof of an obstruction of the administration of justice even where the contempt occurs in the court's presence; and *United States ex rel. Robson v. Oliver*, 470 F.2d 10, 12 (7th Cir.1972), in this circuit, so holds. See also *In re Kirk*, 641 F.2d 684, 687 (9th Cir.1981); *Gordon v. United States*, 592 F.2d 1215, 1217 (1st Cir.1979). A more recent Supreme Court decision, *United States v. Wilson*, 421 U.S. 309, 315, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186 (1975), though altogether more hospitable to the contempt power than *McConnell*, also implies that conduct in the presence of the court must constitute an obstruction in order to be actionable as a contempt under section 401(1). And so we shall assume for purposes of deciding the present case, merely noting in passing that none of the courts that have discussed the question have considered the grammatical and historical considerations that indicate that the requirement of showing an obstruction of the administration of justice was not intended to apply when the contempt was committed in the court's presence.

■■■ But our assumption does not carry the day for the appellants. If a defense lawyer, knowing as he must that a judgment of acquittal cannot be set aside no matter how egregiously the jury disregarded the law or the facts and that a judge will be reluctant to declare a mistrial toward the end of a protracted criminal trial, deliberately exceeds the proper bounds of cross-examination in an effort to obtain his client's acquittal, he is violating the ground rules of the adversary struggle, and therefore obstructing the administration of justice. The only question therefore is whether the lines of questioning that the appellants were pursuing exceeded—so clearly that it could be inferred that they were acting willfully and therefore contemptuously—the proper bounds of cross-examination, and we think the answer is yes. To ask a witness for legal conclusions, and to do so as a vehicle for misleading the jury—whether into thinking that drug dealers cannot be arrested unless they are found with illegal drugs actually on their person (Werksman), or that the fact that police officers sell merchandise to known drug dealers is irrelevant to a charge that the officers are involved in a protection racket (Wolfson)—exceeds those bounds by a wide margin.

■■■ The appellants also violated section 401(3), because they disobeyed the district court's lawful orders regarding the permissible scope of cross-examination. See *In re Gustafson*, 650 F.2d 1017, 1020 (9th Cir.1981) (en banc). In Wolfson's case it was also disobedience of the judge's order sustaining an objection to the very question that she went ahead and completed after the objection was sustained. (True, no objection had been made, but the judge's order—"sustained"—was all the more emphatic on that account.) The appellants argue that the judge should not have fenced in their cross-examination so tightly. That is irrelevant. An order, to be lawful, need not be correct. The proper remedy for error in trial rulings is appeal

rather than defiance, *Sacher v. United States*, 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952); *Commonwealth of Pennsylvania v. Local Union 542*, 552 F.2d 498, 505–06 (3d Cir.1977), unless the practical consequences of the order that is defied cannot be corrected by an appeal, *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1157–58 (7th Cir. 1984) (en banc), which is not the case here: an error in curtailing cross-examination is reviewable by this court on appeal from the final judgment. The appellants point out that such an error might be deemed harmless by the appellate court. But if it is harmless, their clients have no reason to complain about it. The appellants' real concern is that the error might be harmful yet the appellate court might erroneously rule that it was harmless. This is possible, of course; but to use this possibility as the basis for excusing the appellants' misconduct is to make the fallibility of the appellate process a ground for defiant behavior in the trial court. A lawyer could never be held in contempt for disobeying a trial judge's order.

■ We are not much impressed by the appellants' talk about their obligation to their clients and about what they choose, unfortunately as it seems to us, to describe as the district court's "judicial paranoia" in being concerned that the appellants' "simple questioning" (as they call it) might impair the functioning of the district court. The obligation of counsel is to defend his client within the rules of the game; he has neither duty nor right to break the rules. The appellants thus go too far in stating in their brief, without qualification, that "defense lawyers must not be restricted in the pursuit of their client's causes." Nor is it paranoid for courts to be concerned that improper questioning can give a party—either party—an unfair advantage in litigation. What is true is that, since our adversary system encourages vigorous advocacy to the point where lawyers sometimes forget themselves in the heat of combat, trial judges are not allowed to use the contempt power to ensure an atmosphere of decorous understatement. Disrespectful conduct is

not contemptuous. *In re Dellinger*, 461 F.2d 389, 400 (7th Cir.1972). In *McConnell*, the Supreme Court reversed the contempt conviction of a lawyer who had said to the trial judge, after the judge had ruled that the lawyer could not ask a particular line of questions, "we have a right to ask the questions, and we propose to do so unless some bailiff stops us." 370 U.S. at 235, 82 S.Ct. at 1292. This was insubordinate; but since, despite his bold words, the lawyer did not attempt to pursue the forbidden line of questions, the Supreme Court held that he was not guilty of contempt. In this case the judge found the lawyers guilty of contempt only after repeatedly warning them not to ask the questions that he punished them for asking when they persisted.

■ We turn to the question whether summary procedure was proper. Rule 42(a) of the Federal Rules of Criminal Procedure provides that "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." These conditions are satisfied here, and there is nothing on the face of Rule 42(a) (or of Rule 42(b), which provides that "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice," and goes on to set forth detailed procedural requirements that were not followed here) that suggests any limitation on the use of summary procedure in any case within the scope of Rule 42(a). The Supreme Court, however, has said that Rule 42(a) should be used sparingly; and from the Court's by no means unwavering pronouncements on the subject (compare *Wilson, supra*, with *McConnell, supra*) this court has distilled the rule that a contempt may be punished under Rule 42(a)—even if all of the conditions stated in the rule are fulfilled—only if in addition "there is a 'compelling reason for an immediate remedy' or time is of the essence." *United States v. Moschiano*, 695 F.2d 236, 251 (7th Cir.1982).

This rule can best be understood as an application of the general formula of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), for determining how many procedural safeguards are required in particular classes of case to satisfy the requirements of due process. Applied to a summary proceeding the formula requires a comparison of the benefits of a fuller proceeding in avoiding errors (benefits that are a function of the magnitude as well as probability of the errors that would be avoided) with the costs of that procedure. As there is no statutory limit to the size of the fine that can be imposed for a contempt under Rule 42(a)—though appellate courts can cut down a contempt sanction that is unreasonable in relation to the contempt, *United States v. Martinez,* 686 F.2d 334, 341–42 (5th Cir.1982)—there is no reason to think that this formula will yield the same conclusion in every case where a contempt is committed in the presence of the court. The appellants were fined $500 and $300 respectively, which is close to the bottom of the severity range. (It is true that any sanction for contempt could open a lawyer to disciplinary proceedings that might result in much heavier sanctions. But the smaller the fine, the less likely such collateral sanctions are; and the appellants express no concern that such sanctions might be imposed.) And not only were the fines small, but the likelihood that they were imposed erroneously (and that the errors would have been caught in a fuller Rule 42(b) proceeding) was slight. Unlike a case where the alleged contempt consists of throwing an ink well at the bailiff, here the entire conduct constituting the alleged contempt was recorded in a court reporter's stenographic transcript the accuracy of which is not questioned. It is hard to see what kind of evidentiary hearing could profitably have been conducted. The only two questions we can think of that might have been gone into at such a hearing were whether Werksman spoke in a loud and sarcastic tone of voice and whether Wolfson heard the judge say "sustained" while she was in the middle of her question. We do not believe that the findings of contempt or the sanctions imposed would have been different if these rather peripheral issues had been subjected to full adversary examination before another judge.

Although the benefits of a fuller proceeding would not have been great, the costs might well have been. The judge was concerned that if the lawyers persisted in their improper questioning they would wreck a long trial involving grave charges of public corruption. The lawyers had given no indication that they would obey the judge's rulings. They might have been more impressed if the judge had issued the notice that is required for a contempt proceeding under Rule 42(b), but there were risks in following that procedure, too. During the period in which a Rule 42(b) proceeding was wending its way to a hearing (which might have had to be before a different judge because of the penultimate sentence of Rule 42(b)), Werksman and Wolfson might have persisted in their improper questioning to the point where a mistrial would have had to be declared—after more than a month of trial of ten defendants. The case is thus unlike *Moschiano,* where the judge did not adjudge the contempt until after the trial was over, which showed there was no need for haste. There was such a need here—or so it reasonably appeared to the judge; and *Moschiano* holds that "when the court makes an explicit determination that there was a compelling need for an immediate remedy, we shall give appropriate deference to that finding, which is one the trial court is particularly qualified to make in the first instance." 695 F.2d at 252. The district judge had the feel of the trial and a much better sense of these lawyers' pertinacity than we can get from the cold transcript. See *In re Gustafson, supra,* 650 F.2d at 1018–23, where summary contempt was held proper on rather similar facts.

Of course the fact that Rule 42(a) authorizes summary procedure does not mean that the judge must or should dispense with *all* procedure. Dissenting in *United States v. Galante,* 298 F.2d 72,

76–79 (2d Cir.1962), Judge Friendly argued that to hold a person in contempt without giving him an opportunity to be heard, however briefly, before sentence was imposed was so grave a violation of due process as to require reversing the contempt conviction, even though the appellant had not raised the issue either in the trial or the appellate court. That was a dissenting opinion; but a later decision (albeit in a different circuit) holds that, before summarily holding a person in contempt, the trial judge should both warn the person of the consequences of his persisting in the allegedly contemptuous conduct and give him an opportunity to be heard on the question. *United States v. Brannon*, 546 F.2d 1242, 1249 (5th Cir.1977); see also the American Bar Association's Standards for Criminal Justice at p. 6–53 (2d ed. 1980); 3 Wright, Federal Practice and Procedure: Crim.2d § 708 at p. 846 (1982). However, the Supreme Court in *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), while indicating that this was indeed the better procedure, see *id.* at 498–99 and n. 8, also indicated that a trial judge may, "for the purpose of maintaining order in the courtroom, . . . punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him." *Id.* at 497. For this proposition the Court cited *Ex parte Terry*, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888), which explicitly so holds. See *id.*, 421 U.S. at 307–10, 9 S.Ct. at 80–1. And *United States v. Wilson, supra*, 421 U.S. at 316, 95 S.Ct. at 1806, also cites *Ex parte Terry* with apparent approval.

 The judge could have adjourned the trial briefly while he gave Werksman and Wolfson a chance to explain themselves before he held them in contempt and to comment on the appropriate size of fine before he sentenced them. In hindsight we think that would have been a better course of action; it would not have delayed the trial for more than a few minutes or encouraged the appellants in their contumacious conduct, yet it would have given them the rudiments of notice and opportunity to be heard, which are the fundamental elements of due process of law. But in the circumstances of this case, even if we thought *Ex parte Terry* had been overruled we would not hold that the procedure followed by the district judge was reversible error. He had on several occasions warned the lawyers that he would not allow them to pursue the lines of questioning that he later held to be contemptuous. And on one of these occasions he allowed them to explain at length why they thought the questioning was proper. They thus were on notice that if they persisted they would be disobeying the judge's orders, an explicit ground for a contempt finding, see 18 U.S.C. § 401(3), and they had an opportunity to explain why they thought they should be allowed to ask the questions nevertheless. And in light of the district judge's very full and convincing explanation of his actions in the written orders that he issued shortly after adjudging the appellants in contempt, we think it inconceivable that he would have come to a different conclusion if he had given them additional notice or held a brief hearing before holding them in contempt; and as the fines he imposed were small it is also unlikely that the appellants could have persuaded him to make them still smaller. Because the additional procedure would have made no difference to the outcome, we do not think its omission, even if erroneous (which the continued authority of *Ex parte Terry* makes us doubt), requires reversal.

The judgments of contempt are

AFFIRMED.