## INDIANAPOLIS WATER CO. v. AMERICAN STRAWBOARD CO.

(Circuit Court, D. Indiana. October 20, 1893.)

### No. 8,719.

1. NUISANCE—EQUITABLE RELIEF—POLLUTION OF STREAM.

A corporation organized for the purpose of supplying a city with water can only gain a standing in a court of equity, to enjoin a pollution of the stream whence it obtains its supply, by reason of special pecuniary damage caused to it; but when it is thus in court the relief will be granted, not only on that ground, but also on the ground of benefit to the public, which uses the water.

2. SAME—DEFENSES.

It is no defense, to a suit for creating a nuisance by befouling a stream, that others are also engaged in committing similar acts.

3. SAME—ESTOPPEL.

Mere silence during the erection of a factory on a stream creates no estoppel against a riparian proprietor in respect to the enforcement of his right to have the water flow in its natural purity.

4. SAME—PUBLIC POLICY.

As against the right of a riparian proprietor to have water flow in its natural purity, there is no public policy in favor of industrial development which will justify the erection and operation of a factory that pollutes the stream, provided that the most modern appliances are used to prevent it.

5. SAME—EQUITY JURISDICTION—INJUNCTION.

Injunction is the only adequate remedy for the continued pollution of a stream by the operation of a factory, to the injury of a riparian proprietor, when the extent of the injury is contingent and of doubtful pecuniary estimation. 53 Fed. Rep. 970, reaffirmed.

In Equity. Suit by the Indianapolis Water Company against the American Strawboard Company to enjoin the pollution of a stream. A demurrer to the original and supplemental bills was heretofore overruled. 53 Fed. Rep. 970. Injunction granted.

A. C. Harris and Baker & Daniels, for complainant.

Jump, Lamb & Davis, George Shirts, and Kern & Bailey, for defendant.

BAKER, District Judge. The bill seeks injunctive relief to prevent the alleged pollution of the water of White river by the defendant to the damage of the complainant. It charges that the complainant is the owner of a system of waterworks constructed under statutory power for the purpose of supplying water for domestic uses and for the extinguishment of fires to the inhabitants of the city of Indianapolis, and that it is the owner of a canal by a title derived by mesne conveyances from the state. It avers that its water supply is obtained by the inflow of water into a gallery of more than 1,000 feet in length, and of considerable width, formed by an excavation made into the water-bearing gravel underlying the city, which gallery is dug alongside of, and several feet below, the bed of the river, and at a distance from it of a few feet at some points, and at a distance of more than 100 feet at other points. The inflow of water into the gallery is alleged to come from the water-bearing gravel on the one side, and

from the infiltration of water from the river passing through the loose gravel on the other side. It is also alleged that at times of drouth, when the water becomes low, and at all times when large quantities of water are required to extinguish fires, the natural inflow of water into the gallery must necessarily be supplemented by letting water through a flume or waterway provided with a filter, from the river into the gallery. It alleges that the canal, which is taken from the river at the upper side of the dam at Broad Ripple, extends to a point below Washington street, in the city of Indianapolis, and that for 50 years its successive owners have continuously used the water of the canal for hydraulic purposes, and for making ice upon the canal, and for supplying its water to adjacent ponds for making ice for domestic and other uses. It also avers that it has sold, under contracts running for several years, the privilege of taking ice from the canal, and of drawing water therefrom to supply ice ponds, from which it derives an annual income of $4,000. It charges that late in the year 1890, without complainant's consent, the defendant erected at Noblesville, near the bank of White river, a strawboard factory, and began to operate it in March, 1891, and has continued to do so ever since. That it daily discharges from its works 3,000,000 gallons of water, and uses 80 tons of straw, 27 tons of lime, and 5 gallons of muriatic acid, all of which are worked upon by the water passing through the factory, by which means the water passing from it into the river is charged with 67 tons of refuse matter. It is claimed that the water in the river is thereby polluted so as to become discolored, offensive to the smell and taste, unwholesome for domestic uses, and destructive of the fish in the stream. In the latter part of the spring, and again in September, 1891, the complainant notified the defendant that it was polluting the water of the river to its damage, and requested it to desist. The defendant thereupon agreed to stop the pollution of the river, and promised, if the complainant would refrain from any judicial proceedings for three weeks, that it would provide such appliances and devices as would remove the polluting substances from the water flowing from its works into the river. This, it is charged, the defendant attempted, but failed to accomplish. The case was put at issue, and a great mass of testimony was taken, and has been introduced on the hearing, to support the respective contentions of the parties. The case has been ably and elaborately argued, both orally and in printed briefs, and the court has given it attentive consideration. The testimony is too voluminous to justify, or even to permit, its review in detail, and the court must content itself with a statement of the conclusions it has reached.

The testimony, in my judgment, shows that the defendant, during the summer and fall of 1891, daily discharged from its factory, while in operation, into White river, large quantities of refuse and decomposable matter, which corrupted its waters so as to discolor the same, and to render them unfit for domestic uses and destructive of the fish in the river. This condition of the stream extended down the river to the dam and pond at Broad Ripple,

though the effect of these deleterious substances carried by the water in suspension and solution was somewhat less apparent at that point than in those parts of the river in closer proximity to the factory. The water in the canal, which is taken from the pond at the Broad Ripple dam, was discolored and was so injuriously affected in color and quality by pollution arising from the refuse matter passing from the factory as to be unfit for use in making ice for domestic purposes, though some of the ice formed from the water of the canal was used for the purposes of refrigeration. While the pollution of the water in the gallery arising from the operation of the factory was not great, I think it is fairly shown that at times the quality of the water was injuriously affected to such an extent as to materially and sensibly impair its fitness for drinking purposes. The water in the river was low during the greater part of the year 1891, in consequence of a severe and protracted drouth, and the injurious effects arising from its pollution were more observable than they were in 1892, when the river carried a much larger volume of water. When the complainant notified the defendant of the damage done to it by the discharge of the refuse matter into the river, and asked that it be stopped, the defendant acquiesced in the justice of the request, and promised to construct such appliances and devices as would prevent further injury. The defendant dug a settling pond of about five acres in extent, having a wasteway to conduct the water from the pond into the river. The most of the water escaped at first from the pond into the wasteway through a body of gravel intended to act as a filter. The testimony shows that it was never sufficient to remove more than one-half of the refuse matter from the water passing from the pond into the river, and that after a few months the bottom of the pond was covered to a considerable and constantly increasing depth with the decomposing and other refuse matter from the factory, and that the gravel filter became so clogged that the water passed from the pond over its top, having parted with only a small portion of its deleterious ingredients. I think the devices of the defendant are almost wholly valueless for the purpose of freeing the water from its pollution, and I entertain no doubt that whenever the river, in consequence of drouth, carries as small a volume of water as it did in 1891, its pollution will be substantially as great as it was in that year. The water in White river from February until August, 1892, was unusually high, and in the month of June there was a great flood. While the water in the river remained in this condition, the refuse matter discharged into it produced no sensible pollution in the canal or in the water gallery, though it was doubtless present in minute quantities. The channel of the river was thoroughly cleansed by the June flood, and the water of the river did not disclose any considerable pollution until the latter part of August. From that time until the latter part of October, when the taking of the testimony closed, it is fairly shown that the purity of the water in the pond at Broad Ripple and in the canal was materially and sensibly affected by the operation of

the factory. In my opinion, the testimony shows such adulteration of the water in the canal from the presence of the refuse matter held in solution and suspension, attributable to the operation of the factory, as to render the ice formed on the canal and in the adjacent ponds unfit for domestic use. The testimony does not shew that the quality of the water in the gallery and in the water mains of the city was sensibly affected during the year 1892, except for a short period after the fire in January of that year. A large number of analyses of water taken from the river made in 1889, when compared with like analyses made since the factory went into operation, shows the purity of the water has greatly changed for the worse. No other efficient cause for such deterioration is shown except such as arises from its pollution by the deleterious substances discharged by the defendant into the river. In my judgment, the greater purity of the water in 1892 is attributable to the volume of the river, rather than to the remedial effect of the receiving pond and its appliances.

In ruling on the demurrer the court has passed upon the principal questions of law raised on the final hearing. Indianapolis Water Co. v. American Strawboard Co., 53 Fed. Rep. 970. But little more need be said. It is settled that the complainant owns the canal with its bed and banks in fee, and is clothed with the right to take and sell ice therefrom. Waterworks Co. v. Burkhart, 41 Ind. 364; Cromie v. Board, 71 Ind. 208; Nelson v. Fleming, 56 Ind. 310; Frank v. Railroad Co., 111 Ind. 132, 12 N. E. Rep. 105. Its right to enjoy the canal free from pollution is none the less because it is an artificial stream; nor can the defendant successfully contest the complainant's right to use the water of White river to feed its canal. Hydraulic Co. v. Boyer, 67 Ind. 236; Magor v. Chadwick, 11 Adol. & E. 571; Wood, Nuis. § 446. The canal was state property, constructed for public purposes. The complainant has become vested, by mesne conveyances and by various legislative acts, with authority to maintain a system of waterworks to supply the inhabitants of the city of Indianapolis with water for domestic purposes and for the extinguishment of fires. While it is a private corporation, it performs a most important public service; and, while the wrong complained of inflicts a special pecuniary loss on the complainant alone, it directly affects the health and comfort of the public. When a corporation thus obtains a standing in court by reason of its having suffered special damage, although it can only maintain its suit for an injunction on that ground, still the court will grant relief, not solely because the nuisance is private, so far as the complainant is concerned, but because the relief will inure to the public benefit. Woodruff v. Mining Co., 18 Fed. Rep. 753; Railroad Co. v. Ward, 2 Black. 485.

It is claimed that the people living along the river pollute the water by draining into it the filth and other refuse matter which accumulate on their premises. But it is no answer to a suit for creating and maintaining a nuisance that others, however many, are committing similar acts. Each one is liable to a

separate suit, and may be restrained. Wood, Nuis. § 689; Chipman v. Palmer, 77 N. Y. 51.

It is urged that the defendant is prosecuting a business useful in its character, beneficial to the public, and furnishing employment to a large number of men, and that it is conducted with skill and prudence, and with the most approved machinery, and, if damage results, it arises from no fault of the defendant; and that in such cases the ancient rigor of the law has been modified in furtherance of industrial progress and development. This contention finds no support, either in principle or authority. It is rudimentary that no man can be deprived of life, liberty, or property but by due process of law, nor can private property be taken, even for a public use, without just compensation first having been made or received; and under no form of government having regard for man's inalienable rights can one be permitted to deprive another of his property without his consent and without compensation, on the plea that the injury to the one would be small, and the advantage to the other, or even to the public, would be great. This principle has its sanction in the consciousness and right reason of every man, and is asserted by the concurrent judgments of all courts which administer an enlightened system of jurisprudence.

The complainant is not estopped to maintain its suit because it knew that the defendant was building large and expensive works for the manufacture of strawboard, and made no objection thereto. The defendant had better means of knowing whether the operation of its factory would create a nuisance than the complainant had. There is no proof that the complainant knew, or had the means of knowing, that the water in the river would be polluted by the factory until after it was in operation. In such case no estoppel can arise. To constitute an estoppel in pais it must appear that the person sought to be estopped has made an admission, or done or omitted an act, with the intention of influencing the conduct of another, or which he had reason to believe would influence his conduct, inconsistent with the evidence he proposes to give or the title he proposes to set up; that the other party has acted upon, or been influenced by, such act or admission; that the party so influenced will be prejudiced by allowing the truth of the act or admission to be disproved. I fail to discover any element of an estoppel in the case.

It was said, and I think correctly, in ruling on the demurrer, where the right of a riparian proprietor to the use and enjoyment of the flow of a stream of pure and wholesome water, free from corruption and pollution, has been actually invaded, and such invasion is necessarily to be continuing, and to operate prospectively and indefinitely, and the extent of the injurious consequences is contingent and of doubtful pecuniary estimation, the writ of injunction is not only permissible, but it affords the only adequate and complete remedy. In my opinion, such a case has been made by the proof in this case. There will be a writ of injunction awarded.