COLUMBIA AVE. SAVING-FUND, SAFE-DEPOSIT, TITLE & TRUST CO. OF PHILADELPHIA v. PRISON COMMISSION OF GEORGIA et al.

(Circuit Court, W. D. Georgia. February 28, 1899.)

1. NUISANCE—POLLUTION OF WATERS OF A STREAM—RIGHT TO INJUNCTION.
   To entitle a water company, using water from a stream to supply the inhabitants of a city, to an injunction to restrain another riparian owner above from a contemplated use of his property, otherwise legitimate, on the ground that it will create a nuisance, by pollution of the waters of the stream, it must be made to appear with practical certainty that such result will follow, and will cause substantial injury to the plaintiff, or detriment to the public using the water.

2. SAME—EVIDENCE CONSIDERED—ENJOINING ERECTION OF PUBLIC BUILDINGS.
   Defendants, the prison commissioners of the state of Georgia, contemplated the erection of prison buildings and a hospital for state prisoners on a farm situated on Fishing creek, from which stream, lower down, the complainant obtained the water which it supplied to the inhabitants of the city of Milledgeville. None of the contemplated buildings were to be nearer to the stream than one-eighth of a mile, and the intervening land

was to be cultivated. No sewer or stream was to be conducted from the buildings to the creek. *Held*, that such facts did not authorize a court of equity to enjoin the contemplated use of the property on the ground that the water supply of the complainant would be thereby contaminated; it not appearing that such contamination would necessarily result, and the presumption being that the defendants, as public officers, would take all necessary or proper measures to prevent it.

This was a suit in equity by the Columbia Avenue Saving-Fund, Safe-Deposit, Title & Trust Company of Philadelphia against the prison commission of Georgia, the city of Milledgeville, and others, for an injunction against a threatened public nuisance.

Hall & Wimberly and Marion Erwin Roberts, for plaintiff.

Jos. M. Terrell, Atty. Gen. of Georgia, and J. T. Allen, City Atty. of Milledgeville, for defendants.

SPEER, District Judge. To entitle the plaintiff to the relief it seeks against the prison commission of Georgia, it must demonstrate by a preponderance of evidence that the structures proposed by the state, and the uses for which they are intended, will pollute the stream from which the water supply of Milledgeville is obtained. The burden of proof is upon the plaintiff in this, as in all cases. If the evidence indicates that a polluting stream, or infectious matter, would assuredly be commingled with the waters of Fishing creek above the intake of the plaintiff's works, in view of the expert testimony and the scientific authorities quoted the plaintiff would have made a prima facie demonstration, supporting its right to the injunction. In that event the defendant, the prison commission, would be under the necessity of producing evidence to satisfy the court that no injury would ensue to the plaintiff or to the public from such contamination. In other words, some actual or practically certain invasion of the rights of the riparian proprietor or user of the water must appear, before the court will be justified in denying to an adjacent landowner the use, otherwise legitimate, of his property. The citations of authority, accumulated by the assiduity of the plaintiff's solicitors, were perhaps not needed to inform the court that the distinct and continuous pollution of water by a riparian proprietor is a private, and may be a public, nuisance, which equity may enjoin. That nuisance was early defined. The riparian proprietor may not erect upon the banks of the stream any works which render the water unwholesome or offensive. A glover, we find from the Year Books, was in the time of Henry II. inhibited from constructing a lime pit for calf or sheep skins so near the water as to corrupt it. A tan yard so situated has been thus judicially denounced when it had the effect of rendering the water unwholesome, whether the riparian proprietor below used it for distillation, or culinary or domestic purposes. Howell v. McCoy, 3 Rawle, 256; opinion of Justice Story in Tyler v. Wilkinson, 4 Mason, 397, Fed. Cas. No. 14,312, and of Lord Ellenborough in Bealey v. Shaw, 6 East, 208; Ang. Water Courses (3d Ed.) p. 20.

We may well adopt the language of Justice Story in Tyler v. Wilkinson, supra:

"The law here, as in many other cases, acts with a reasonable reference to public convenience and general good, and is not betrayed into a narrow

strictness, subversive of common use, nor into extravagant looseness, which would destroy private rights."

In the precedents brought to the attention of the court by the learned counsel for the plaintiff, it will be generally found that the injunction has been granted only when the water of the plaintiff has been actually invaded by the contaminating agency. Thus, in the Case of Indianapolis Water Co. v. American Strawboard Co., cited from 57 Fed. 1000, decision by District Judge Baker, the defendant daily discharged into the stream "large quantities of refuse and decomposable matter, which corrupted its waters so as to discolor the same, and render them unfit for domestic use, and destructive of the fish of the river." So, in the Kentucky case of Herr v. Asylum, 30 S. W. 971, the authorities of this institution, by means of their sewers, discharged into a branch running through the plaintiff's grounds all manner of slops, offal, and garbage. The court of appeals of Kentucky enjoined the lunatic asylum. In Barrett v. Association (Ill. Sup.) 42 N. E. 891, a large cemetery was drained directly into a stream from which the plaintiff conducted the operations of his dairy, and also had been in the habit of harvesting ice for sale in Chicago. Nothing could be more injurious to the character of the water, as testified to by experts, or more repulsive to the imagination. What, therefore, would be more objectionable as contamination to the water supply? In the case of Village of Dwight v. Hayes (Ill. Sup.) 37 N. E. 218, the defendant was emptying into the creek, a few rods above the plaintiff's land, the sewage from a village of 1,500 inhabitants. In the case of Kinnaird v. Oil Co. (Ky.) 12 S. W. 938, the oil of the defendant leaked from the casks, saturated the ground, penetrated to the base of water, and contaminated the spring. In view of the well-known character of kerosene oil, its presence in the spring was doubtless easily perceptible.

Indeed, it has been very clearly stated in Gould on Waters (section 220, p. 390):

"Proprietors upon streams may cast sewage and waste material therein, if they do not thereby cause material injury to public or private rights. The natural right of one proprietor to have the stream descend to him in its pure state must yield in a reasonable degree to the equal right of the upper proprietors, whose use of the stream for mill and manufacturing purposes, for irrigation, and domestic purposes will tend to make the water more or less impure, especially when the population becomes dense. So, it is of public importance that the proprietors of useful manufactories should be held responsible only for appreciable injury caused by their works, and not for slight inconveniences or occasional annoyances. When an injunction is sought to stop large and expensive works which cause a stream to be polluted, it must clearly appear that the legal remedy is inadequate, and that the plaintiff will suffer irreparable injury from the continuance of the pollution."

If that is true with regard to private institutions, a fortiori is it true with regard to a great institution of the state, necessary for the well-being of the community, essential to the exercise of the police power, and at the same time for the humane treatment of convicts. The reason for the distinction thus made by the courts seems to be as practical as just. A disease germ, or a cluster of such germs, may possibly find lodgment in the water supply of a city from ordinary farm work on the stream above. For this reason, is the owner up the stream to be

denied the right to cultivate or to fertilize his lands? Must he exclude from his acres the cattle yard, the pasture, or the sheepfold? Disease, often resulting in death, originates at human habitations. For this reason, will cottages, villages, or towns be forever excluded from the area of water supply of downstream communities? The exigencies of modern civilization, and the increasing density of population, forbid this. It would doubtless be well for all of our municipalities if they could be supplied with streams as pure as those which flow through granitic aqueducts constructed by Pisistratus 2,500 years ago, and which yet bear refreshment from Pentelicus and Hymettus to classic Athens, or such as flow down to the "Eternal City" from the springs of Cæruleus and Curtius, and from Lake Sabatinus, over marvelous structures built in the time of Claudius, Caligula, and Trajan, or which come down from the Balkans, replenish the fountains of the Seraglio, and revive the sinking subjects of Abdul at Constantinople, after they have swept through curving aqueducts designed by the genius of Justinian's architects, or those which flow to Glasgow, along channels cut through the adamant from the romantic shores of Loch Katrine, made immortal by the "Lady of the Lake." We can no longer, however, attain the ideal in the purity of our water supply, and courts must be guided by contemporary conditions.

Now, how can it be said, in a practical and legal sense, that the contemplated action of the prison commission will invade the rights of the plaintiff, and pollute the water supply of Milledgeville? No sewer, no stream, from the prison edifice, will be conducted into this water supply. A portion of the surface water may find its way there in those torrential downpours which in past ages have worn the country around that historic city until its lofty summits resemble, to some extent, the "mountains round about Jerusalem." In such event, the surface flow would pass the intake with such rapidity that, if it contained a germ, the chances are infinitesimal but that the noxious microbe would be swept past the intake, into the Oconee, and out to sea, where it would miserably perish. The building for males is 1,320 feet,—440 yards from the stream. It is more than an eighth of a mile from the female building to the stream. The land will be cultivated, and loose earth and its powers of oxidation are powerful disinfectants. The luxuriant crops will take up and modify the evasive bacillus. But it is objected that bathtubs will be furnished the convicts, and at times it is anticipated that they will bathe. This innovation seems startling to counsel, and may be bad for the bacilli; but it is not plain how it will be injurious to the plaintiff. Nor can the further fact, dwelt upon, that at intervals clothing will be washed, and floors scoured, affect the issue. Cleanliness will be conservative of health, and thus the danger of infection and disease will be diminished. The prison commissioners are public officers. Surely, then, we may invoke, as to them, the ancient maxim, "Omnia præsumuntur rite et solemniter esse acta donec probetur in contrarium." It is to be presumed, even if their assurances under oath to this effect were absent, that the commissioners will do their whole duty to the public, and to the convicts in their charge. This requires the prevention of contamination of this water, from which the prison itself will

be supplied.    Nothing more could be required of them.    This presumption has the effect of evidence demonstrative of the fact that they will do everything which the teachings of modern sanitary science may dictate to preserve this water from pollution.    Indeed, so far as the court has been able to gather from the intelligent and candid testimony of the chairman of the prison commissioners, and the voluntary amendment to their answer, by which they offer to change the site of the hospital, and consent to select new sites for the male building and for the female building, to conform to the wishes of the board of health of Milledgeville, they have already evinced much solicitude to protect the purity of this water.

As not uncommon in such cases, scientific experts differ as to the probability that this water may be contaminated because of the prison, and, as also common in such cases, the court must form its own independent judgment.    I am very clearly of the opinion that the water supply of Milledgeville, drained in part from this extended watershed now to be under the careful inspection of the state officials, will be under a larger and a more careful scrutiny and guardianship than ever before.    Indeed, the removal of the numerous settlements of careless and thriftless tenants, with their pigsties, mule pens, manure heaps, disregard of cleanliness, their washing places with tubs of foul water on the branches and at the springs, all familiar to every one acquainted with the methods of nomadic tenants, will be a positive benefaction to the people using the waters of Fishing creek.    Indeed, from the evidence it appears that heretofore the banks of this creek have been to some extent used as a dumping ground for the remains of those hapless beasts of burden whose maltreatment and premature death is, in my opinion, the greatest cause for the poverty of the farmers of this section of the South.    Then, too, we must consider the great benefaction to the state and the people involved in the construction of this prison.    We must regard the greatest good to the greatest number. We must bear in mind that the treatment of children and infirm convicts at certain previous periods of the history of our state has been a reproach to the people, and that all the impulses which actuated the creation of this farm were benevolent.    This being true, it is improper for the court to stand in the way of its completion.    As to the state, the injunction will be denied.    No injunction is asked at this time against the city of Milledgeville; but, in view of the somewhat equivocal conduct of the mayor and council of that municipality, the bill will be retained in court, so that at any time, if, in violation of what seem to be the equities existing in behalf of the water company, they proceed to inflict any illegal injury upon the latter, by violation of their contract, it will be competent for the court to exercise its powers to protect the interests of the parties.