THROPP v. HARPERS FERRY PAPER CO.

(Circuit Court of Appeals, Fourth Circuit. December 22, 1902.)

No. 440.

1. WATER COURSES—POLLUTION—RIGHT TO INJUNCTION.

A lower riparian owner is entitled to protection by injunction from the pollution of the stream which prevents his reasonable use of it, in the absence of special equities or qualifying circumstances which take the case out of the general rule.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Waters and Water Courses, § 66.

Pollution of water courses, see note to 37 C. C. A. 538.]

2. SAME—IRREPARABLE INJURY.

Complainant established a pulp mill on the Potomac river a few miles below an ore bank which had been worked for many years, and for the last few with washers to free the ore from the clay; the waste water being run into settling pools and allowed to clear before being returned to the river. Subsequently defendant acquired the ore bank, greatly enlarged the works, and ran the waste water from the washers directly into the river, so discoloring the water with clay and ochre that complainant was obliged to stop its mill for about one-half the time. Held that, in the absence of proof by defendant that complainant could avoid the injury at a reasonable expense, the latter was entitled to an injunction restraining defendant from polluting the stream; it further appearing that he could provide settling pools, as formerly done, for a moderate outlay.

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Martinsburg.

This case comes before us on appeal from a decree of the Circuit Court of the United States for the Northern District of West Virginia. The case went to final hearing upon bill, answer and the report of a special master accompanied by the testimony taken by him. The court granted a perpetual injunction restraining and inhibiting the defendants from in any wise polluting and contaminating the Potomac river by running into it waste water from defendant's washers and machinery at Virginia Ore Bank, in Jefferson county, W. Va. From that decree the defendant has appealed. The Harpers Ferry Paper Company, the complainant, operates a pulp mill on the Potomac river at Harper's Ferry. It acquired the land and water rights on the Potomac and Shenandoah rivers at Harpers Ferry by purchase, in 1888, from the United States, which formerly for many years had maintained there a factory for the manufacture of arms. Having acquired the title of the United States, the complainant erected at this point its pulp mill in the year 1888, and successfully operated it until January, 1901. It then found that by reason of the impurity and discoloration of the water of the river, it was obliged to stop its mill about one-half the time, and that the impurities were the result of the operations of the defendant Thropp at the ore bank, about four miles above the pulp mill, on the same side of the river, and caused by the defendant Thropp having greatly increased his operations, and by his washing the clay from the ore by a force of water pumped up from the river and returned to the river discolored with red, yellow, and brown ochre and clay. This bill was thereupon filed January 24, 1901, praying an injunction to prevent the defendant from fouling the river and thus destroying the use of complainant's mill for manufacturing pulp. The ore bank, which had then been recently acquired by the defendant Thropp, has been from time to time operated for about a century. Prior to 1868 the ore exhumed from the defendant's ore bank was separated from the substance with which it was mixed, or encrusted, by screening, and the refuse was not carried to the river. In 1868 there was a washer erected, and the washings, which were inconsiderable, flowed into the river. In 1888 the second ore washer was built, and the washings from this were run alternately into two settling ponds on the land of the owner of the ore bank. Occasionally it would happen that the embankments of the settling ponds would break and the washings would escape into the river, but this was only by accident, and upon complaint from the managers of the pulp mill the managers of the ore bank always remedied the evil. The defendant Thropp acquired the ore bank property about one year before the filing of this bill, and at first he operated it as it had been operated before, making use of the old settling ponds, but a short time before the filing of this bill, he established the present washer, which is of very much greater capacity, and he employed a greatly increased force of workmen, and now runs the washings directly into the river, without settling ponds, partly because he desires to excavate from the bottoms of the old settling ponds the fine ore which has accumulated there, and which is valuable. The complainant had formerly a settling pool near to its pulp mill, which was of use when the river was discolored by washings from its banks at times of rain and freshet. The land on which the pool was located was condemned for the use of the Baltimore and Ohio Railroad Company, and for two years before the filing of the bill the complainant had no settling pool, of its own. The master, in his most careful report and well-considered conclusions, finds the facts to be as stated in the bill of complaint. He finds that the present method of running the ore washings into the river so discolors the water that it compels the pulp mill to close down its operations half the time, and to this extent its business is destroyed, and it suffers irreparable injury. He suggests, as the practical remedy, that the defendant cause to be made sufficient settling pools on land adjoining the ore bank property, which is cheaply obtainable, and, while other remedies are discussed by him in his report, this is the only one which he reports as reasonably certain of success at a moderate cost.

R. T. Barton, for appellant.

James D. Butt and Forrest W. Brown, for appellee.

Before SIMONTON, Circuit Judge, and MORRIS and WADDILL, District Judges.

MORRIS, District Judge (after stating the facts). The special master found as a fact, and the evidence fully establishes, that the water pumped up from the river and used to wash the ore excavated from defendant's land, is returned to the river muddy and discolored with yellow, red and brownish ochre, and that the discolored ore washings flowing down the river and entering the complainant's mill race compel the complainant to close down its mill one-half the time, and does the complainant's manufacturing business irreparable injury. These facts, if unaffected by any special equities or qualifying circumstances, entitle the complainant to an injunction. 28 Am. & Eng. Encyclopedia of Law, 969; Merrifield v. Lombard, 13 Allen (Mass.) 16, 90 Am. Dec. 172; Sterling Iron & Zinc Co. v. Sparks Mfg. Co. (N. J. Err. & App.) 38 Atl. 426; Travis Placer Co. v. Mills, 94 Fed. 909, 37 C. C. A. 536, and cases collected in the note on page 538; Gladfelter v. Walker, 40 Md. 1; Baltimore v. Warren Mfg. Co., 59 Md. 96; Indianapolis Water Co. v. Am. Strawboard Co. (C. C.) 57 Fed. 1000; Miss. Mills Co. v. Smith, 69 Miss. 299, 11 South. 26, 30 Am. St. Rep. 546; Drake v. Lady Ensley Coal Co., 102 Ala. 501, 14 South. 749, 24 L. R. A. 64, 48 Am. St. Rep. 77; Middlesex v. Lowell, 149 Mass. 509, 21 N. E. 872.

Starting with this undeniable proposition, we are to consider what circumstances appear in this case which should take it out of the general rule, that the lower riparian owner is entitled to be protected by injunction from pollution, which prevents his reasonable use of the stream. It may be admitted that if the complainant, with reasonable cost, can remedy the pollution of the stream, he should do so and be left to his action for damages against the defendant. But as the defendant is the wrongdoer, and the pollution, while it lasts, is prohibitive of the use of the water for complainant's pulp mill and destructive of its business, it is but just that the remedy should be pointed out, its cost shown to be reasonable, and its success should be fairly certain. The defendant contends that a clearing pool at the pulp mill, or an enlarged filtering apparatus, would be a sufficient remedy. But there is no certainty whatever that either of these methods would be effectual, and the report of the special master is that they would cost far in excess of the cost of a remedy open to the defendant, and which in former times proved itself to be effectual and satisfactory as then used. The other methods suggested by the defendant as open to the complainant, viz., by pumping directly from the river below the dam of the mill; by bringing water from the dam, either by pipes laid in the race or along the banks of the river; by bringing clear water from Pitcher's run; by bringing clear water across from the Maryland side of the river in pipes; by bringing water from the Shenandoah river. All of these remedies are of very doubtful efficiency and of very considerable cost, as shown by the

testimony, and are so found by the master in his very careful and comprehensive report.

There is one remedy open to the defendant which, under a former use of the ore bank on a smaller scale of excavation, did for some 10 years prove reasonably sufficient to prevent injury to the pulp mill, and that is by acquiring land adjoining the ore bank sufficient for adequate settling pools for the ore washing, so that when delivered to the river the ore water would be nearly, if not entirely, free from discoloration, and would then have what additional clearing would result from flowing three miles in the river bed to the complainant's mill race, and for one mile in the race. In the present case the pollution of the river does not occur in any natural flow of water to the river, nor from the natural drainage of streams found in a mine and pumped out in a natural state. The ore bank is on a hill which slopes to the river. The ore is excavated from the side of the hill and raised by a tramway to near its summit, where the washer is placed. The water of the river is forced up by pumping to a tank near to the washer, and is run through it, cleansing the ore of the clay, ochre and earth which has adhered to it. The water then, by a ditch, is returned to the river heavily ladened with the deleterious coloring matter. The trouble is created entirely by the mechanical means adopted by the defendant to cleanse his ore, and the obligation rests upon him to exhaust all reasonable means to prevent injury to those who are entitled to use the river water, and if these fail, to desist.

The defendant confessedly has done nothing on his part to remedy the wrong. The ore bank has been worked for very many years, not, however, continuously. The finding of the special master is that prior to 1868 the ore was screened and the refuse thrown into dumps. In 1868 the first ore washer was erected and its washings, during the intermittent times it was in operation, flowed into the river. In 1888 the second ore washer was put into operation, and in order to prevent pollution of the river from the increased operations, and injury to the pulp mill, two settling ponds were constructed by the operators of the ore bank, which were used alternately to give time for the washings to settle and clear before being allowed to run into the river. These settling ponds proved reasonably effective and prevented trouble, except occasionally, when the retaining dams of the ponds would give way and the ore washings escape into the river. This, however, upon complaint from the pulp mill, was always remedied. It further appears that the present defendant acquired the ore bank property some time in 1900, and at first operated it as it had been by the previous owners, but in December, 1900, or January, 1901, he began operations on a much larger scale with the present very much larger washer, employing many more men, and washing a great quantity of ore, and running the washings directly into the river without intervening settling ponds. In January the water had become so discolored that the pulp mill, from January 14, 1901, was required to be stopped nearly half the time. The pulp mill was constructed in 1888, and began manufacturing wood pulp in March, 1889. Up to that time there was no noticeable discoloration of the water from

the ore bank, so that it cannot be charged that the pulp mill was built in the face of an obvious menace, or of any prescriptive right, and it was not until the present owner of the ore bank, in January, 1901, established his operations on a much enlarged scale and with no settling ponds that the pulp produced by the mill, which for 10 years had been of good quality and in demand, became from the water discolored and unsalable.

It is urged against the complainant that it had at one time a settling pool which it used to clear the water which came from the river before using it in making pulp, and that the Baltimore & Ohio Railroad Company, in 1893, having condemned land of the complainant's, on which the pool was located, and paid for it, the complainant has not constructed another in its place. This settling pond of the complainant was effective in clearing the occasional muddy condition of the water caused by rains and freshets, but the testimony is not convincing that it would eliminate the paint-like substance which the defendant's method of operation discharges into the river; and before the defendant started his method of operation the pulp mill had been operated satisfactorily without the settling pond, formerly on its land, for several years. It is the defendant whose new method of operation has caused the injury, and it is for him to find the remedy, and he cannot call upon the complainant to initiate costly experiments to obviate a difficulty which he alone has caused.

We think that on the facts, as they appeared at the final hearing, the decree continuing the injunction was right. It enjoined the defendants "from polluting and contaminating the waters of the Potomac river by running therein the waste from their washers and machinery at the Virginia Ore Bank." It is, however, very desirable on all accounts that some means should be devised by which this valuable ore can be utilized, and as it does not seem altogether improbable that some practicable method may be perfected involving very slight cost or inconvenience to the complainant, therefore, while we affirm the decree granting the injunction, we remand the case to the court below, so that if in that court a proper showing should be made, by which it is made to appear that some reasonable means has been devised by which the ore bank can be worked without injury, or great risk of injury, to the complainant, and without putting the complainant to unreasonable expense or inconvenience, then, if necessary, the injunction may be modified.

Affirmed.