**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Louis MOSCHIANO and Robert Fred Bishop, Defendants-Appellants.**

**In re Stephen M. KOMIE, Respondent-Appellant.**

**Nos. 81–2017 to 81–2019.**

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1982.

Decided Nov. 29, 1982.

Terence F. MacCarthy, Carol Brook (June B. Fournier on the brief) Federal Defender Program, Chicago, Ill., for Moschiano.

Stephen M. Komie, Chicago, Ill., for Bishop.

Robert S. Bailey, Paul Bradley, Allan A. Ackerman, Stephen J. Broussard, Melvin Lewis, James Montgomery, George C. Pontikes, Chicago, Ill., for Komie.

Michele E. Smith, Katherine Goldwasser, Asst. U.S. Attys., Dan K. Webb, U.S. Atty., for plaintiff-appellee.

Julius L. Echeles, Caroline Jaffe, National Ass'n Criminal Defense Lawyers, Chicago, Ill., amicus curiae.

Before CUMMINGS, Chief Judge, GIBSON, Senior Circuit Judge,[*] and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

These consolidated appeals arise out of the joint trial of defendants Louis Moschiano and Robert Fred "Pete" Bishop on charges of conspiracy to distribute heroin (Count One) and distribution of heroin (Count Two) in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976). The jury found Moschiano guilty on both counts but found Bishop guilty only on Count One.[1] Moschiano, who asserted at trial a defense of entrapment, assigns as error the admission into evidence of his own statements made during the course of a post-indictment drug transaction; this evidence was offered by the government to prove Moschiano's predisposition to commit the offense charged. Bishop contends on appeal that he was prejudiced by the joint trial and that his motions for severance were erroneously denied. We affirm the convictions of both defendants.

We also have before us the appeal of respondent Stephen M. Komie, counsel for Bishop, who was found guilty of criminal contempt by the trial court for his pursuit of a prohibited line of questioning during the trial. Because we conclude that the district court improperly resorted to summary procedures, we reverse Komie's conviction and remand the case for plenary disposition.

I.

The criminal charges in the instant case were the product of a fairly typical undercover investigation by the Drug Enforcement Administration ("DEA"). This investigation culminated on September 11, 1980, in the sale by Moschiano of one pound of heroin to confidential informant Robert Milas and DEA Agent Arthur Tahauri. We briefly recite the facts relating to this transaction, which are largely undisputed, as well as the other evidence bearing on these appeals.

On September 8, 1980, Milas met Moschiano at a restaurant in Calumet City and discussed the purchase of heroin from him. Moschiano said that the heroin would cost $1,600 an ounce and also showed Milas some heroin in the trunk of his car. The next day, Moschiano called Milas to say that he had something for Milas, and the two met later in the day to examine a cellophane

---

[*] The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. The district court sentenced Moschiano to four years of imprisonment on each count, to run concurrently, followed by a special parole term of nine years. Bishop received a sentence of three years of imprisonment for his conviction on Count One.

bag containing what Moschiano represented was heroin. Milas and Moschiano agreed to meet again on September 11 to complete the sale.

Milas was accompanied at the September 11 meeting by Agent Tahauri, who posed as Milas' buyer. Moschiano was accompanied by Bishop, who was there, according to Moschiano, to negotiate the deal. Bishop got into Agent Tahauri's car and the two discussed the proposed sale, agreeing finally on the sale of one pound of heroin for a price of $22,000. Moschiano and Bishop departed, presumably to get the heroin, but returned empty-handed, demanding to see their buyers' money before delivering the goods. Eventually, Moschiano returned to the scene alone and handed Agent Tahauri a paper bag containing heroin, boasting that, "[T]his is the best heroin you can have in the area." Moschiano was immediately placed under arrest. Bishop was arrested more than two months later.

At trial Bishop did not present any evidence. Based on the cross-examination of government witnesses and on the testimony of Moschiano, Bishop argued that he was an unwitting participant in, or had withdrawn from, the scheme to sell heroin. Specifically, Bishop relied on testimony by Milas that he was surprised to see Bishop with Moschiano on September 11 and that he heard Bishop say, "I don't want anything to do with it. It is all Lou's deal." Moschiano also testified that he never told Bishop that he was selling heroin and that Bishop walked out when he discovered the truth.

Moschiano asserted a defense of entrapment and testified in his own behalf. In summary, Moschiano's testimony was that Milas had, since April 1980, repeatedly asked Moschiano to sell him drugs and that in order to get Milas off his back he decided to play "big shot" by supplying Milas with the requested heroin. Moschiano freely admitted that he delivered the heroin to Agent Tahauri on September 11, but he insisted that it was all Milas' idea.[2]

To discharge its burden of rebutting Moschiano's entrapment defense, raised in opening argument, the government introduced in its case-in-chief evidence of Moschiano's participation in other narcotics transactions occurring prior to his arrest on September 11, 1980. In June 1980, Moschiano agreed to sell an undercover DEA Agent one ounce of cocaine; this deal ultimately failed when the white powder tendered by Moschiano was discovered not to be cocaine. In August 1980, Moschiano negotiated a purchase of 300 to 500 pounds of marijuana from Milas; this transaction was not consummated because Moschiano was unable to raise the necessary money. These two transactions were placed in evidence by the testimony of government agents and by tape recordings of conversations involving Moschiano.

Following Moschiano's testimony about entrapment, the government offered in rebuttal the testimony of DEA Agent Richard Kazmar. His testimony figures in all three appeals presently under consideration. Agent Kazmar was allowed to testify that on December 5, 1980, approximately one month after the return of the indictment against the defendants, he met with Moschiano, posing as a pharmaceuticals salesman. Moschiano asked Agent Kazmar to sell him 50,000 Preludin[3] tablets, and indicated that he intended to sell the pills to truck drivers. Agent Kazmar told Moschiano that the price for these pills would be approximately $50,000. During the course of this conversation, Moschiano also made a number of statements concerning his previous heroin sale and subsequent arrest on September 11. Agent Kazmar testified that he met with Moschiano on two subsequent occasions but that the negotiations were discontinued by Moschiano because he thought he was being followed. The proposed transaction was never consummated.

## II.

Moschiano's appeal focuses exclusively on the testimony of DEA Agent Kazmar. As

---

**2.** Larry Zieboda, a friend of Moschiano, also testified that Milas had encouraged Moschiano to sell drugs and that Moschiano told Milas that he would not do so.

**3.** Preludin, an amphetamine, is a Schedule III controlled substance. 21 U.S.C. § 812 (1976).

indicated above, Agent Kazmar was permitted to testify at trial that after Moschiano's indictment, he met with Moschiano and, posing as a pharmaceuticals salesman, negotiated an illegal sale of $50,000 worth of Preludin tablets to Moschiano. Significantly, the government sought to introduce Moschiano's statements only with respect to the Preludin negotiations and did not seek to use Moschiano's admissions relating to the pending heroin charges. Agent Kazmar's testimony was offered by the government on two theories: as evidence of Moschiano's predisposition to commit the heroin offenses charged in the indictment, and also as evidence impeaching certain statements made by Moschiano during cross-examination. The district court accepted the testimony on both theories but we consider the evidence only with respect to Moschiano's entrapment defense because the district court instructed the jury to consider Agent Kazmar's testimony for this purpose only, without mentioning impeachment.

Moschiano contends that Agent Kazmar's testimony was inadmissible for two reasons. First, Moschiano argues that the introduction into evidence of his own statements, deliberately elicited by a government agent in the absence of counsel, violated the sixth amendment right to the assistance of counsel, as enunciated in *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Second, he maintains that evidence of subsequent crimes is inadmissible under Rule 404(b) of the Federal Rules of Evidence when offered to prove predisposition. We address these claims in turn, reject both of them, and affirm Moschiano's conviction.[4]

### A.

Our starting point in analyzing Moschiano's sixth amendment claim is the Supreme Court's decision in *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In that case, the defendant, after having been indicted and having retained counsel, made incriminating statements to his co-defendant (turned government informer), in whose car government agents had installed a radio transmitter. At trial, the defendant's incriminating statements were brought before the jury through the testimony of the government agent who monitored the receiving device. The Court held that the defendant

> was denied the basic protections of that guarantee [assistance of counsel under the sixth amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

377 U.S. at 206, 84 S.Ct. at 1203. *See also United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *United States v. Malik,* 680 F.2d 1162 (7th Cir. 1982). This holding rests on the proposition that once adversary proceedings have been commenced against an individual, he has a right to legal representation when the government interrogates him. *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977).

The Court in *Massiah* made clear, however, that it was entirely proper to continue the investigation of the suspected criminal activities of the defendant even though he had already been indicted. 377 U.S. at 207, 84 S.Ct. at 1203. It is equally clear that *Massiah* offers no immunity from liability for uncounseled, post-indictment statements that involved criminal acts or constituted criminal acts in themselves. Such statements, even though deliberately elicited by government agents after indict-

---

4. Moschiano also argues that Agent Kazmar's testimony was inadmissible for impeachment purposes because the statements sought to be impeached were elicited by cross-examination beyond the scope of Moschiano's direct testimony. Moschiano relies on *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), which, however, deals only with the impeachment use of unconstitutionally-obtained evidence. *See United States ex rel. Doss v. Brewer,* 685 F.2d 1003 (7th Cir.1982). We do not reach this issue because, as discussed below, we hold that Agent Kazmar's testimony was admissible as substantive evidence.

ment and in the absence of counsel, may form the basis for a separate or superseding indictment and may be offered to prove such additional charges. *Hoffa v. U.S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Hinton,* 543 F.2d 1002, 1014–15 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *United States v. Osser,* 483 F.2d 727, 730–34 (3rd Cir.), *cert. denied,* 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973); *United States v. Missler,* 414 F.2d 1293, 1302–03 (4th Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970). The case before us poses a somewhat different question. Moschiano's post-indictment statements concerning the proposed purchase of Preludin tablets involved a separate crime (and thus could have been included in a separate or superseding indictment), but were offered into evidence at the trial on the charges in the indictment pending at the time of the Preludin negotiations. This situation, not directly controlled by *Massiah,* has been considered in only a few cases.

One such case is our own decision in *United States v. Merritts,* 527 F.2d 713 (7th Cir.1975). In *Merritts,* the defendant, the president of a school board, was charged with using interstate facilities with intent to commit a crime of violence to further an illegal activity. 18 U.S.C. § 1952 (1976). Specifically, he was accused of plotting the murder of a fellow school board member in order to prevent interference with the defendant's continued receipt of kickbacks from the school district's suppliers. After the return of the indictment against him, the defendant attempted to contact one supplier to negotiate a kickback. The supplier reported the incident to the FBI and agreed to follow the FBI's instructions to

go along with the defendant's overtures. A meeting between the defendant and the supplier was arranged, during which the defendant made some admissions bearing on his guilt of the crime for which he had been indicted, and he also solicited a bribe from the supplier. This conversation was recorded on a hidden device. Subsequently, the government secured a superseding indictment to include the solicitation of the bribe. In fact, this new allegation was an essential element of the crime previously charged because the original indictment had omitted an allegation of the performance of an act. The government sought to introduce at trial the post-indictment conversation as proof of this element of the offense.[5]

This court held that *Massiah* did not prohibit the admission of the evidence concerning the solicitation of the bribe:

> *Massiah* applies to incriminating statements about past conduct obtained after indictment through the equivalent of police interrogation. It does not confer immunity for utterances, such as Merritts' solicitation of a bribe, which are not statements about past conduct but constitute criminal acts in themselves. It does not confer a right to the assistance of counsel in committing a new crime or in completing an old one.

527 F.2d at 716. Thus, we held that it was permissible for the government to use as substantive evidence of guilt on the pending indictment uncounseled, post-indictment statements that constituted criminal acts and did not refer to past misconduct.

We adhere to this distinction between post-indictment statements relating to new criminal acts and post-indictment statements constituting admissions of past wrongdoing.[6] The former are generally

---

**5.** The government in *Merritts* conceded that the defendant's post-indictment admissions bearing on past conduct were inadmissible. Thus, the only issue before the court was the admissibility of evidence relating to the solicitation of the bribe. 527 F.2d at 714 & n. 2.

**6.** *See also United States v. Calhoun,* 669 F.2d 923, 925 (4th Cir.), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982) (*Massiah* holds "that constitutional rights are violated

where the government covertly gathers admissions of some past wrongdoing of which a suspect already stands accused, while different or subsequent criminal acts may be secretly investigated even though the target is under suspicion of another earlier crime"); *United States v. Taxe,* 540 F.2d 961, 969 (9th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977) (focus of *Massiah* is on "self-incrimination on the existing charges").

outside the protection of 'Massiah because no person has a constitutional right to the assistance of counsel while committing a crime. The latter type of statements are generally not admissible at trial on the pending indictment because they do not represent or evidence the commission of a separate crime and because they are the kind of utterances for which the assistance of counsel could legitimately play a useful role. In the instant case, Moschiano's post-indictment statements concerned a separate crime—the attempted purchase of Preludin tablets without a prescription—and were therefore unprotected by the exclusionary rule of Massiah.[7]

Further support for this conclusion may be found in the First Circuit's decision in Grieco v. Meachum, 533 F.2d 713 (1st Cir.), cert. denied, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976). In that case, a habeas corpus petitioner (Cassesso) was charged in state court with crimes related to the murder of one Edward Deegan. After indictment and while incarcerated pending trial, Cassesso through an intermediary approached a fellow prisoner, Glavin, who was then serving a life sentence. Cassesso offered Glavin $50,000 if he would confess to the Deegan murder. Glavin contacted the FBI, who advised him to speak to Cassesso as if he were going along with Cassesso's plan. At trial, Glavin testified to Cassesso's post-indictment conversations with him. These statements were presumably received as admissions by a defendant tending to show a guilty consciousness.

Denying habeas corpus relief, the court in Grieco rejected Cassesso's argument that Massiah precluded the introduction at the murder trial of evidence of his conversations with Glavin. Distinguishing Massiah, the court stated that "Cassesso's statements . . . were primarily uttered in the commission of another substantive offense, subor-

nation of perjury, and were only incidentally admissible in his trial on the pending indictment." 533 F.2d at 717 (footnote omitted). Thus, as in Merritts, the court in Grieco considered it dispositive that the post-indictment statements sought to be introduced at trial on the pending indictment constituted criminal activity. It would be a different case, the court continued, "had the statements of Cassesso been innocuous except for their implication of consciousness of guilt of the prior crime . . . ." 533 F.2d at 718. Accordingly, Grieco confirms this court's holding in Merritts that post-indictment statements which are criminal acts in themselves may be introduced, where appropriate, at the trial of the charges alleged in the indictment pending at the time the utterances were made.[8]

The Grieco court went further, however, and announced an additional limitation on its holding. Noting that its decision might have been different "[h]ad the government's intention been to obtain testimony against Cassesso for use at the trial for Deegan's murder," the court emphasized that the government had acted in good faith in investigating another crime. 533 F.2d at 718. We would concede that at least in egregious cases, Massiah would prohibit the use of evidence of post-indictment criminal activity under circumstances in which that evidence was procured not through an independent investigation into continuing or separate criminal activity but instead through a confrontation with government agents engineered for the purpose of creating evidence to use against the defendant at the trial of the indicted offenses. One such case is United States v. Anderson, 523 F.2d 1192, 1195–96 (5th Cir. 1975), in which the court reversed a defendant's conviction on narcotics charges because of a Massiah violation. The court observed that the post-indictment evidence

---

**7.** We note again that Moschiano's statements pertaining to the indicted heroin offenses were not offered into evidence.

**8.** Moschiano argues that Grieco was effectively overruled by United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). We

cannot agree. Although the factual circumstances of the two cases show some similarity, the Henry case did not address the issue whether post-indictment statements relating to new criminal activity could be used to prove the charges in the pending indictment.

was not the product of an ongoing investigation but rather was a "special single-shot confrontation ... arranged by the DEA to obtain from the defendant evidence of specific intent to shore up the government's case." 523 F.2d at 1196.

The instant case is not in the same class as *Anderson.* Here, the government's investigation of Moschiano's efforts to purchase a large quantity of Preludin tablets was commenced independently of the heroin case.[9] The two investigations proceeded separately and, although DEA Agents Grassman and Kazmar learned of the pending charges against Moschiano, this fact came to their attention only after a routine search of the DEA's computer in the normal course of their investigation. Agent Kazmar did have three brief and quite innocuous conversations with Agent Morley (the case agent handling the heroin investigation),[10] but these communications ceased after an Assistant United States Attorney advised Agent Kazmar not to discuss the Preludin case with agents involved in the heroin investigation. We agree with the district court's conclusion, announced after exhaustive *voir dire,* that the government's investigation of the Preludin matter was undertaken in good faith and not for the purpose of eliciting incriminating statements to be used at the heroin trial.

Consequently, we hold that *Massiah* forbids the use at trial of uncounseled, post-indictment statements relating to past wrongdoing and, at least where there is involved a bona fide investigation of separate or continuing criminal activity, does not prohibit the use at trial of uncounseled, post-indictment statements that constitute criminal acts in themselves or relate to new criminal activity. Because the prosecution in this case did not seek to use Moschiano's admissions about the heroin charges but instead sought only to use evidence of statements relating to a separate crime, we conclude that Moschiano was not deprived of his sixth amendment right to the assistance of counsel.

## B.

 It is well-established that the government, in meeting its burden of rebutting an entrapment defense, may introduce under Rule 404(b) of the Federal Rules of Evidence [11] the defendant's *prior* criminal acts in order to prove predisposition, provided, as always, that the proffered evidence satisfies the requirements of Rule 403.[12] *United States v. Murzyn,* 631 F.2d 525, 528–29 n. 2 (7th Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981); *United States v. Burkley,* 591 F.2d 903, 921 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). While conceding this point, Moschiano contends that evidence of *subsequent* similar acts is

---

**9.** The Preludin investigation originated in the volunteered information of Moschiano's personal physician, who was contacted by the FBI in connection with an arson investigation. The physician told the FBI that Moschiano had sought to purchase Preludin tablets from him. The matter was referred to DEA Agents Grassman and Kazmar, who pursued it.

**10.** First, prior to his first undercover meeting with Moschiano on December 5, 1980, Agent Kazmar, in order to protect himself, asked Agent Morley what kind of man Moschiano was. Second, shortly after the December 5 meeting, at which Moschiano made statements concerning the indicted crimes, Agent Kazmar asked Morley if the statements were true. Third, also after the December 5 meeting, Agent Kazmar inquired about the person retained by Moschiano as defense counsel.

**11.** Rule 404(b) provides:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**12.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

irrelevant to prove predisposition and must accordingly be deemed inadmissible *per se.* Thus, he argues that the admission into evidence of his attempted purchase of Preludin tablets from Agent Kazmar was reversible error.

A number of courts, including this one, have rejected such a *per se* rule. In *United States v. Carreon,* 626 F.2d 528, 535–36 n. 14 (7th Cir.1980), we stated:

> While it is true that predisposition turns on a defendant's mental state prior to commission of the crime, that mental state may be proved by relevant and admissible evidence concerning the defendant's actions either before or after commission of the crime.

Other courts have reached the same conclusion. *United States v. Mack,* 643 F.2d 1119, 1121–22 (5th Cir.1981); *United States v. Burkley, supra,* 591 F.2d at 921–22; *United States v. Brown,* 567 F.2d 119, 120 (D.C.Cir. 1977) (per curiam); *United States v. Rodriguez,* 474 F.2d 587, 591 (5th Cir.1973).[13] We now reaffirm our statement in *Carreon* and join these other circuits in holding that subsequent similar acts may, under proper circumstances, be admissible to prove the defendant's predisposition to commit the crime charged. Although less probative on this issue than prior similar acts, *United States v. Carreon, supra,* 626 F.2d at 535–36 n. 14; *United States v. Jimenez,* 613 F.2d 1373, 1376 (5th Cir.1980), the commission of similar crimes after the indicted offense does have a tendency to make it more probable that the defendant was predisposed to commit the offense charged. Of course, the admissibility of any particular subsequent act will depend on a number of factors, especially the balancing of probity and prejudice mandated by Rule 403. We hold only that such evidence is not always inadmissible.

■ Having declined Moschiano's invitation to adopt a *per se* rule, we proceed to consider his claim that the evidence of the attempted Preludin purchase was so unlike the heroin offenses charged in the indictment that it should have been excluded because the danger of unfair prejudice substantially outweighed the minimal relevan-

**13.** The cases relied on by Moschiano do not support his proposed *per se* rule. *United States v. Wilson,* 636 F.2d 225, 228 (8th Cir. 1980), involved not an entrapment defense but the use of subsequent acts to prove intent to convert government property; the court held such evidence admissible but, in affirming a judgment of acquittal, stated that "the fact that evidence is admissible does not mean it is sufficient to prove intent." *United States v. Boyd,* 595 F.2d 120, 126 (3d Cir.1978), involved the use of post-conspiracy conduct admitted by the trial court to prove the existence of a conspiracy. No entrapment defense was raised, but the court, in upholding the trial court's refusal to allow the testimony on the theory that it proved propensity, noted that: "Even recognizing that time and space are only relative concepts, we have not yet come to the point where the government, in meeting an anticipated entrapment contention, can show predisposition by subsequent activity." Because no entrapment defense was raised and because this ruling by the trial court was not the subject of the appeal, this passage is dictum. *United States v. Anglada,* 524 F.2d 296 (2d Cir.1975), held only that it was error not to permit the entrapment issue to go to the jury; admissibility of the evidence to rebut that defense was not at issue. *United States v. Frost,* 431 F.2d 1249, 1251 (1st Cir.1970), *cert. denied,* 401 U.S. 916, 91 S.Ct. 896, 27 L.Ed.2d 817 (1971), upheld the trial court's refusal to allow the *defendant* to prove entrapment by means of his own post-arrest conversations. The case thus stands for the unremarkable proposition that a defendant can only be entrapped by events occurring *before* commission of the acts charged. Finally, Moschiano lays heavy emphasis on *United States v. Daniels,* 572 F.2d 535 (5th Cir.1978), which held that the government could not use, for the purpose of proving predisposition to distribute heroin, the fact that the defendant was three months later arrested for possession of a sawed-off shotgun. The court's decision was grounded both on the fact that the gun possession was subsequent to the indicted offense and on the conclusion that the two acts were so dissimilar that the subsequent crime had insufficient probative value on the issue of predisposition. In both prior and subsequent cases, however, the Fifth Circuit has permitted the use of subsequent criminal acts to prove predisposition, *United States v. Mack, supra; United States v. Rodriguez, supra,* and the *Daniels* case has been read to mean only that subsequent acts are *less* probative on the issue than prior acts, *United States v. Jimenez,* 613 F.2d 1373, 1376 (5th Cir.1980). *Daniels* consequently provides no support for a rule of *per se* inadmissibility.

cy and probative value of the evidence.[14] We think the evidence was properly admitted. Evidence of Moschiano's attempt to purchase a large amount of Preludin was relevant and probative with respect to the heroin charges because both reflected Moschiano's involvement in large scale distribution of narcotics. Moschiano's principal argument is that the subsequent act evidence has little evidentiary value because it involved Preludin rather than heroin and because it involved a purchase by Moschiano rather than a sale. This attempt to differentiate the two transactions is futile. Although Moschiano negotiated a purchase of Preludin tablets, the announced reason for the purchase was to sell the pills later to truck drivers. Hence, both transactions in essence involved distribution. And whether or not, as Moschiano asserts, Preludin has a legitimate medical use while heroin does not, both transactions were patently illegal. "The relevant factor is the type of activity undertaken, not the identity of the drugs." *United States v. Segovia*, 576 F.2d 251, 252 (9th Cir.1978). Here, the nature of the activity was substantially similar to the indicted offenses: the distribution of commercial quantities of controlled substances.[15] Moreover, we reject Moschiano's contention that the Preludin deal was so remote in time (three months) from the heroin sale as to strip the later act of evidentiary value. *Cf. United States v. Burkley, supra,* 591 F.2d at 921 (2½ months). Finally, we do not agree with Moschiano that the government's need for the subsequent act evidence was so slight as to warrant its exclusion. *See United States v. Dolliole,* 597 F.2d 102, 106 (7th Cir.), *cert.*

*denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979).

The district court in the instant case made extensive findings under Rule 403. Such findings are entitled to substantial deference. *United States v. Dolliole, supra,* 597 F.2d at 107. The district court also carefully instructed the jury to consider the evidence of the Preludin negotiations only with respect to Moschiano's defense of entrapment. Weighing all of these factors, we conclude that the district court did not abuse its discretion in admitting the subsequent act evidence to prove Moschiano's predisposition.

### III.

Defendant Bishop argues that his conviction for conspiracy to distribute heroin must be reversed because the district court's refusal to grant his several motions for severance deprived him of a fair trial.[16] He argues that a joint trial with defendant Moschiano was unfair because the two defendants pursued inconsistent defenses and because the testimony offered to rebut Moschiano's entrapment defense had a prejudicial spillover effect on Bishop's case.

A motion for severance is committed to the sound discretion of the district court, whose decision will be set aside only if the discretion was clearly abused. *Opper v. U.S.,* 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Berardi,* 675 F.2d 894, 900 (7th Cir.1982). The denial of a motion for severance will only rarely be reversed on appeal and then only for the most cogent reasons. *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.),

---

**14.** Similar act evidence must be "clear and convincing" before it may be received, but direct testimony of the defendant's participation in the other crime is ordinarily held to satisfy this test. *United States v. Dolliole,* 597 F.2d 102, 106–07 (7th Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979). In the instant case, Agent Kazmar gave direct testimony of Moschiano's attempt to purchase the Preludin tablets and so we conclude that the subsequent act evidence was clear and convincing.

**15.** For this reason, the instant case is quite different from those in which possession of one

type of drug was offered to prove predisposition to distribute another kind of drug. *See, e.g., United States v. Bramble,* 641 F.2d 681 (9th Cir.1981); *United States v. Jimenez, supra.*

**16.** Rule 14 of the Federal Rules of Criminal Procedure provides in pertinent part that "[i]f it appears that a defendant or the government is prejudiced by a joinder of . . . defendants in an indictment or information or by such joinder for trial together, the court may . . . grant a severance of defendants or provide whatever other relief justice requires."

cert. denied, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). To be entitled to a severance, a defendant must establish such prejudice that a joint trial would be unfair, a difficult burden that is not satisfied merely by showing that a separate trial would offer the accused a better chance of acquittal. *United States v. McPartlin, supra,* 595 F.2d at 1333–34. In exercising its discretion, the trial court must give due deference to the strong public interest in favor of a joint trial, particularly where, as here, the indictment charges a conspiracy which may be proved against both defendants by the same evidence and which results from the same act or similar series of acts. *United States v. Papia,* 560 F.2d 827, 836–37 (7th Cir.1977); *United States v. Echeles,* 352 F.2d 892, 896 (7th Cir.1965). Measured against this standard, the denial of Bishop's motions for severance was not in our view an abuse of discretion.

Bishop first contends that severance was necessary because of inconsistent defenses. Moschiano defended on grounds of entrapment while Bishop claimed that he was at most an unwitting accomplice of Moschiano and that he withdrew from the scheme once he learned that Moschiano was dealing in heroin. "Mutually antagonistic" defenses mandate severance, however, only when the acceptance of one party's defense precludes acquittal of the other. *United States v. Ziperstein,* 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). *See also United States v. Banks,* 687 F.2d 967 (7th Cir.1982). This was plainly not true in the instant case and, indeed, the defenses were not necessarily inconsistent. The jury could

well have believed that Moschiano had been entrapped when he carried out the sale of heroin and yet credited Bishop's defense of withdrawal. *Cf. United States v. Vadino,* 680 F.2d 1329, 1335 (11th Cir.1982) (severance not required when one defendant in joint trial raises entrapment defense). Bishop's theory of the case was, in fact, strengthened by Moschiano's own testimony that he never informed Bishop of his plan to sell the heroin and that Bishop walked out when he discovered the truth. Thus, the alleged inconsistency in defenses did not warrant separate trials.

Bishop in addition argues that a severance was imperative to shield him from the possibly prejudicial impact of the government's evidence showing Moschiano's predisposition. This evidence consisted of testimony concerning prior similar crimes by Moschiano and his post-arrest negotiations for the purchase of Preludin tablets.[17] The district court carefully and repeatedly admonished the jury to consider the evidence only with respect to Moschiano and only with respect to his entrapment defense. "Our theory of trial relies upon the ability of a jury to follow instructions," *Opper v. U.S., supra,* 348 U.S. at 95, 75 S.Ct. at 165, and we have frequently found that appropriate limiting instructions similar to those that were given here are an adequate safeguard against evidentiary spillover. *See, e.g., United States v. Shelton,* 669 F.2d 446, 461 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313, 1319 (7th Cir.) (en banc), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981).

---

17. Bishop also appears to argue that he should have been permitted to elicit testimony that Moschiano in a post-indictment conversation with Agent Kazmar made damaging admissions concerning the indicted heroin charges without mentioning Bishop's name. (In fact, Bishop's counsel tried to elicit such testimony, and this effort resulted in his conviction for criminal contempt. *See* Part IV *infra*). As discussed in Parts I and II, *supra,* Moschiano's admissions were excluded under *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). To have permitted Bishop to introduce this testimony in the joint trial would

likely have so prejudiced Moschiano as to require reversal of his conviction. *See Bruton v. U.S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). If we believed that Moschiano's admissions were of substantial relevance to Bishop's defense, we might conclude that separate trials were necessary. In the instant case, however, the inference that Bishop was not involved in the September 11 heroin sale because Moschiano several months later did not mention Bishop's name when admitting to the heroin sale is simply too weak to require separate trials so as to allow Bishop to get this evidence before the jury.

We recognize, of course, that the likelihood that limiting instructions can reasonably be followed by a jury will depend on the particular circumstances of the case. In this case, we think the possibility of prejudice was rather small. The allegedly prejudicial evidence did not directly inculpate Bishop as it involved transactions in which he played no part. Bishop's theory of the case—that he was Moschiano's dupe—can hardly be said to have been undermined by evidence of Moschiano's other criminal deeds. It is also significant that the jury returned a verdict finding Bishop guilty only on Count One while finding Moschiano guilty on both counts. Such a discriminating verdict is some indication that the jury was able to and did consider each defendant individually. *United States v. Shelton, supra,* 669 F.2d at 461; *United States v. Papia, supra,* 560 F.2d at 837. Thus, we think that the forceful jury instructions given by the district court were effective to prevent evidentiary spillover and that the possibility of prejudice to Bishop was outweighed by the strong public policy in favor of joint trial.[18]

For all of these reasons, we conclude that the district court did not abuse its discretion when it denied Bishop's motions for severance. Accordingly, his conviction is affirmed.

## IV.

Respondent Stephen M. Komie appeals his conviction for criminal contempt. The district court summarily found Komie in contempt of court after he allegedly disobeyed the court's instructions regarding the examination of a government witness.

## A.

We set forth in some detail the circumstances of the alleged contempt and the district court's procedures for adjudicating it because both are central to our conclusion that the procedures employed were inappropriate.

The alleged contempt occurred during the testimony of DEA Agent Kazmar, who testified on behalf of the government. As indicated in our previous discussion of Moschiano's appeal, Agent Kazmar in an undercover operation met with Moschiano on December 5, 1980, and negotiated a sale of 50,000 Preludin tablets to Moschiano. During their conversation, Moschiano made a number of statements about the heroin transaction for which he had been indicted and also about his arrest on September 11, 1980. Agent Kazmar's testimony was offered to rebut Moschiano's entrapment defense.

Extensive proceedings outside the presence of the jury were held to consider the admissibility of Agent Kazmar's testimony. Counsel for Moschiano objected to the proffered testimony on the ground that Moschiano's post-indictment statements were inadmissible under the rule announced in *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Respondent Komie also objected to the testimony on behalf of his client, Bishop. After extended discussion, the district court indicated that Agent Kazmar would be allowed to testify the following day but that certain aspects of his proposed testimony were inadmissible. Specif-

18. Bishop cites in support of his claim of error *United States v. Figueroa,* 618 F.2d 934 (2d Cir.1980). In that case, a divided panel of the Second Circuit reversed the convictions of two defendants because of prejudice resulting in a multi-defendant trial from the admission of prior crime evidence against a third defendant. Two factors distinguish the decision from the instant case. First, the court emphasized that its assessment of the competing values of unfair prejudice and the public benefit of a joint trial was colored by its finding that the prior crime evidence was inadmissible even with respect to the defendant against whom it was offered. 618 F.2d at 947. By contrast, the other crime evidence offered to prove Moschiano's predisposition was, as we have held, admissible against him. Second, the challenged evidence did not in this case bolster the credibility of a government witness and thereby "assure the conviction" of Bishop (as the challenged evidence in *Figueroa* bolstered the evidence of a key witness there). 618 F.2d at 946–47. For in the case before us there was little doubt that Moschiano sold the heroin; the only real issue was criminal disposition. Thus, the credibility of the government agents who testified at trial to Bishop's participation in the sale did not turn on the jury's believing the similar crime evidence.

ically, the court excluded any reference to Moschiano's admissions about the pending heroin case. The discussion continued as follows:

MS. GOLDWASSER: [19] Now as to the initial conversation between the agent and Mr. Moschiano where Mr. Moschiano told him that he had been arrested recently by Kahuna,[20] have you directed also that we should not introduce evidence of that conversation?

THE COURT: Yes.

MR. KOMIE: Well, Judge, I think I should be able to ask him because—

MS. GOLDWASSER: I hope that should your Honor change your mind about the possibility of admitting the testimony on the basis of some of those cases, I would have an opportunity to respond to all the arguments that Mr. McCarthy [21] made.

MR. KOMIE: Judge, the testimony I have heard so far indicates no reference to Mr. Bishop on this case, and again, Judge, it is his deal, it is his operation, and I should be in the position of being able to get this admission before the jury.

THE COURT: What admission?

MR. KOMIE: That my time [ (sic) client] is not involved. I mean, this agent, I'm sure, if asked would say that Mr. Bishop's name was not mentioned.

THE COURT: No. You can certainly ask him that.

MR. KOMIE: But, you see, I think you are prohibiting the government and probably if you prohibit them, you are going to be prohibiting me from asking him about the discussion on meeting Kahuna and so forth.

THE COURT: All right. I will prohibit the government but I will permit you to ask him, "Agent, have you ever seen my client," and you may use a dramatic sweep of the arm along with that question.

MR. KOMIE: Thank you, Judge, but what I was specifically getting to is that there is the admission of the crime without mentioning Bishop.

THE COURT: All right.

That's—I can't let you do that.

MR. KOMIE: Judge, then I renew my motion for a bench because I think that that would certainly be—I mean, I am sure you are thinking, well, that is somewhat cumulative, you haven't articulated that, but I am sure you are thinking that, but if you stop to think about it, it is very persuasive evidence in the minds of the jury or the bench or whoever that it was Lou Moschiano's operation, that poor Mr. Bishop was the flunky or the drone that was necessary to carry the damn thing out.

THE COURT: All right, but I do deny the motion on that basis.

MR. KOMIE: Thank you.

Tr. 758–60. The following day, after further *voir dire,* the district court confirmed its previous ruling that Agent Kazmar could testify so long as no mention was made of Moschiano's statements about the indicted offense.

Agent Kazmar took the witness stand. Neither the government in its direct examination nor counsel for Moschiano in his cross-examination asked about Moschiano's admissions. Respondent Komie then commenced his cross-examination, establishing that in the course of his contacts with Moschiano, Agent Kazmar had never met or heard of defendant Bishop. Komie continued his examination as follows:

Q. You have testified that you had several meetings with Mr. Moschiano; is that correct?

A. That's correct.

. . . . .

Q. At one of these meetings you had a discussion with Mr. Moschiano where he outlined the details of September 11, and did he at any time during that meeting mention the name of Pete Bishop?

A. No Sir.

Q. The name Pete Bishop never came up at any time?

---

19. Counsel for the government.

20. Kahuna was DEA Agent Tahauri's alias.

21. Counsel for Moschiano.

A. No Sir.

Tr. 824. At the conclusion of this examination, the district court, *sua sponte,* called a sidebar with all counsel. The court indicated that it had specifically prohibited counsel from interrogating Agent Kazmar with respect to events that occurred on September 11 and it told Komie, "You have violated the Court's admonition and I will deal with it later." Tr. 825. The district court instructed the government not to pursue this subject on redirect examination and proceedings in front of the jury were resumed.

Agent Kazmar was the last witness to testify at trial. After his testimony, the jury was excused, and the district court once again informed Komie that he had, in the court's opinion, deliberately disobeyed the court's instructions. The district court informed Komie that it intended to order a transcript of the instructions prepared and would call Komie in to discuss sanctions after it received the transcript. Tr. 838. The court further admonished counsel from referring to the prohibited subject during closing arguments; this instruction appears to have been heeded.

The district court heard the matter on May 7, 1981, two weeks after the jury's verdict was returned. In response to Komie's request to clarify the purpose of the hearing, the district court restated its belief that Komie had deliberately disobeyed its ruling and that, "I think it is probably criminal contempt . . . ." Counsel for Komie then asked for written specifications of the contempt and also requested that the matter be set for an evidentiary hearing. A discussion then ensued regarding the notice requirements of Rule 42(b) of the Federal Rules of Criminal Procedure. The court expressed its willingness to proceed with written specifications although noting that there could be little confusion as to which conduct constituted the contempt.

On May 18, 1981, the district court entered an order of contempt summarily finding Komie in contempt of court. In its certificate the district court stated that both during the trial and during the May 7 hearing, it was "clear" that the court would deal with the matter summarily but that it was persuaded by Komie's lawyer at the May 7 hearing that written specifications and an evidentiary hearing were necessary. The certificate continued:

> The Court has now reviewed Rule 42. An evidentiary hearing and written specifications are not necessary since the Court properly may proceed summarily under Rule 42(a). This is because the conduct occurred in the Court's presence.

The district court scheduled a hearing for June 10, 1981, to consider punishment. At that hearing, Komie declined to argue mitigating circumstances because this would have been inconsistent with his position that he committed no act of contempt, an issue about which argument was foreclosed by entry of the summary contempt order. The district court imposed as punishment a fine of $250, representing Komie's compensation under the Criminal Justice Act for his representation of Bishop on the day of the alleged contempt.

## B.

The district court's action in holding Komie in contempt of court is authorized by 18 U.S.C. § 401 (1976), which empowers a federal court to punish as contempt, *inter alia,* "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." [22] Rule 42 of the Federal Rules of

---

**22.** Section 401 provides in full:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, or command.

18 U.S.C. § 401 (1976). The district court did not specify under which subsection it was proceeding. Subsection (2) is inapplicable because lawyers are not "officers" within the meaning of this statute. *Cammer v. U.S.,* 350 U.S. 399, 404–05, 76 S.Ct. 456, 458–59, 100 L.Ed. 474 (1956). The government insists that the con-

Criminal Procedure governs the procedures for adjudicating criminal contempt. Rule 42(a) allows the district court to punish contempt summarily if the judge certifies that he saw or heard the contemptuous conduct and that it was committed in the actual presence of the court. In all other cases, the court must proceed under Rule 42(b), which calls for disposition only after notice and hearing.[23]

Since its promulgation in 1944, Rule 42(a) has been interpreted narrowly by the courts. The Supreme Court has said that Rule 42(a) is reserved for "exceptional circumstances" such as acts threatening the judge or disrupting a hearing or obstructing court proceedings, and that Rule 42(b) specifies the "normal procedure" to be followed. *Harris v. U.S.,* 382 U.S. 162, 164–65, 86 S.Ct. 352, 354–55, 15 L.Ed.2d 240 (1965). This reluctance to expand the power of summary contempt beyond the situations where its use is necessary reflects the extraordinary nature of the power itself. "[C]riminal contempt is a crime in every fundamental respect," and results not infrequently in serious penalty. *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968). Yet summary disposition under Rule 42(a) dispenses with notice and an

opportunity to be heard in defense, rights that are rooted in the due process guarantee and that are "basic in our system of jurisprudence." *Groppi v. Leslie,* 404 U.S. 496, 502, 92 S.Ct. 582, 586, 30 L.Ed.2d 632 (1972); *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). Given the absence of these procedural safeguards and given the reality that contemptuous conduct "often strikes at the most vulnerable and human qualities of a judge's temperament," *Bloom v. Illinois, supra,* 391 U.S. at 202, 88 S.Ct. at 1482, the power of summary contempt is capable of grave abuse, *In re Oliver, supra,* 333 U.S. at 274, 68 S.Ct. at 508; *Ex Parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888), and is properly regarded by the courts with extreme disfavor, *Sacher v. U.S.,* 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952).

Accordingly, the Supreme Court has indicated that the power of summary contempt is limited to cases in which "immediate punishment is essential to prevent 'demoralization of the court's authority' before the public," *In re Oliver, supra,* 333 U.S. at 275, 68 S.Ct. at 509, and that "before the drastic procedures of the summary contempt power may be invoked to replace the protections

---

tempt order was based on subsection (3) and that a showing of an obstruction of justice (an essential element of contempt under subsection (2)) was not required in this case. *See United States v. Seale,* 461 F.2d 345, 369 (7th Cir. 1972). As discussed below, however, an obstruction of justice is a prerequisite to summary contempt. In any event, "flouting a trial judge's commands is the essence of obstructing the administration of justice." *Pennsylvania v. Local Union 542, International Union of Operating Engineers,* 552 F.2d 498, 509 (3d Cir.), *cert. denied,* 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977). As a practical matter, violation of a court ruling during the course of trial may well constitute a violation of either subsection (1) or subsection (3). *Cf. Local Union 542, supra* (contempt under section 401(1) for conduct consisting of trial counsel's violation of seven direct and explicit orders of trial court).

23. Rule 42 provides:

(a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) *Disposition upon Notice and Hearing.* A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

of ordinary constitutional procedures there must be an actual obstruction of justice," *In re McConnell*, 370 U.S. 230, 234, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962). *See also United States ex rel. Robson v. Oliver*, 470 F.2d 10, 12 (7th Cir.1972). These considerations are summarized in the oft-repeated principle that courts are limited in contempt cases to "the least possible power adequate to the end proposed." *United States v. Wilson*, 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821).[24]

The most recent statement from the Supreme Court concerning Rule 42(a) is *United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975). In that case, the trial court had summarily punished two criminal defendants who refused, on fifth amendment grounds, to testify even after being granted immunity and ordered to testify. The Court held that disposition under Rule 42(a) was proper. The Court observed that the defendants' refusals to answer, although not delivered disrespectfully, satisfied the express provisions of Rule 42(a).

> Rule 42(a) was never intended to be limited to situations where a witness uses scurrilous language, or threatens or creates overt physical disorder and thereby disrupts a trial. All that is necessary is that the judge certify that he "saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court."

421 U.S. at 315, 95 S.Ct. at 1806. The Court went on to find that the defendants' actions were intentional and "literally disrupted the progress of the trial and hence the orderly administration of justice." 421 U.S. at 316, 95 S.Ct. at 1806. The Court distinguished its earlier decision in *Harris v. U.S.*, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965), which held that use of Rule 42(a) was improper when a witness before a grand jury

refused to answer questions after a grant of immunity. Because *Harris* did not involve a refusal to testify that obstructed and delayed an ongoing trial, the Court reasoned, there was in that case "no compelling reason for an immediate remedy." 421 U.S. at 318, 95 S.Ct. at 1807. Summarizing its holding, the Court concluded:

> In an ongoing trial, with judge, jurors, counsel, and witnesses all waiting, Rule 42(a) provides an appropriate remedial tool to discourage witnesses from contumacious refusals to comply with lawful orders essential to prevent a breakdown of the proceedings. Where time is not of the essence, however, the provisions of Rule 42(b) may be more appropriate to deal with contemptuous conduct. We adhere to the principle that only " '[t]he least possible power adequate to the end proposed' " should be used in contempt cases.

421 U.S. at 319, 95 S.Ct. at 1808.

 Particularly in light of *Wilson*, we hold that resort to summary disposition of criminal contempt under Rule 42(a) is permissible only when the express requirements of the rule are met and when there is a "compelling reason for an immediate remedy" or time is of the essence. *See In re Gustafson*, 650 F.2d 1017 (9th Cir.1981) (en banc); *In re Chaplain*, 621 F.2d 1272, 1277 (4th Cir.) (en banc), *cert. denied*, 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980); *Fernos-Lopez v. U.S. District Court*, 599 F.2d 1087 (1st Cir.) (per curiam), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Schleper v. Ford Motor Co.*, 585 F.2d 1367 (8th Cir.1978); *Pennsylvania v. Local Union 542, International Union of Operating Engineers*, 552 F.2d 498 (3d Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977); *United States v. Brannon*, 546 F.2d 1242 (5th Cir.1977). Once the literal requirements of Rule 42(a) are satisfied, a trial court's decision to invoke sum-

---

**24.** A further constitutional limitation on the use of summary contempt was announced in *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). In *Taylor*, the Court held that due process requires some sort of hearing before punishment is imposed, at least when a final adjudication of contempt and sentencing are postponed until after the trial at which the act of contempt was committed. Komie contends that he was deprived of such a hearing. Given our disposition of this appeal, we do not address Komie's due process argument.

mary procedures should be reviewed for an abuse of discretion. *In re Gustafson, supra.* When the record does not demonstrate that the trial court fully considered the adequacy of plenary procedures and the necessity for summary disposition, we shall independently evaluate the need for summary procedures. But when the court makes an explicit determination that there was a compelling need for an immediate remedy, we shall give appropriate deference to that finding, which is one the trial court is particularly qualified to make in the first instance. Nevertheless, in light of the serious potential for abuse of the summary contempt power and in view of the potential constitutional problems inherent in its exercise, we emphasize the special duty of an appellate court to give careful and meticulous consideration to the trial court's decision that summary disposition is appropriate.

■ Turning now to the case before us, we conclude that the district court's exercise of summary contempt power must be deemed to constitute an abuse of discretion. The nature of the allegedly contemptuous conduct, as well as the district court's own response to it, demonstrates that there was no compelling need for an immediate remedy and that the "normal procedure" of Rule 42(b) should have been observed. First, the circumstances of the contempt did not warrant summary action. By the time the district court called the sidebar to inform Komie that he had violated its ruling, the contempt was complete. With an appropriate admonition that the prohibited subject was not to be raised during closing argument (an instruction which apparently was obeyed), there was no real threat that the contempt would, or even could, recur. The trial was delayed only for the period of the brief sidebar.

More importantly, perhaps, the district court's own actions following the allegedly contemptuous conduct reflect the inappropriateness of summary action. At the time of the alleged contempt, the court's only response was to call a brief sidebar, inform Komie that he had contravened the court's ruling, and to declare that the matter would be dealt with later. This may have been the most prudent action to take under the circumstances because more formal disciplinary action against Komie could have drawn attention to the prejudicial testimony that the court and parties had labored so hard to exclude from the jury's consideration. After the jury was excused, however, the district court again advised Komie that he had disobeyed a court order, and again postponed the matter. The contempt order was not heard until May 7, 1981, two weeks after the trial had ended. At that time, the district court stated its belief that Komie's conduct was "probably criminal contempt," but the court agreed to follow the plenary procedures described in Rule 42(b). On May 18, the district court issued a contempt order under Rule 42(a), deciding not to proceed under Rule 42(b) because the alleged contempt had occurred in the court's presence.

This sequence of events shows that the district court did not consider time to be of the essence or that immediate punishment was essential. The record reflects that the district court agreed, if only reluctantly, that Rule 42(b) procedures were applicable and only later decided that Rule 42(a) was available. The court reached this decision without considering the necessity for summary disposition and on the basis of its belief that summary punishment was appropriate, if not mandated, because the express requirements of Rule 42(a) were satisfied. Nothing in these proceedings, in short, suggested the presence of "exceptional circumstances" justifying departure from the ordinary procedures of Rule 42(b).[25]

We also observe that the procedures of Rule 42(b) might have been very useful in this case. A conviction for criminal con-

---

**25.** A trial court need not impose instant punishment to invoke Rule 42(a). *Sacher v. U.S.,* 343 U.S. 1, 9–10, 72 S.Ct. 451, 455–56, 96 L.Ed. 717 (1952); *Local Union 542, supra,* 552 F.2d at 512–13. But here, the trial court did not even proceed under Rule 42(a) at the conclusion of the trial and, as this court has noted, "it is settled that a later citation for contempt may require more in the way of procedural protection than would have been necessary for instant action." *United States v. Seale,* 461 F.2d 345, 355 (7th Cir.1972).

tempt under section 401(3) (note 22 *supra*) requires a wilful violation of a court order, the terms of which are "clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed...." *United States v. Joyce,* 498 F.2d 592, 596 (7th Cir.1974).[26] Generally, a transcript of the court's rulings will speak for itself but in a case such as this one, where there is a genuine dispute regarding the content of the court's instructions to counsel, the understanding of other eyewitnesses could prove helpful in deciding whether Komie deliberately disobeyed the court's order, or whether in good faith he adopted a mistaken interpretation of the court's instructions. We express no view on these factual issues but note simply that this was a case in which the normal procedures of Rule 42(b) could have aided the decisional process.

For these reasons, we reverse Komie's conviction for criminal contempt and remand the case for plenary proceedings consistent with this opinion.

Nos. 81–2017 & 2018: AFFIRMED.

No. 81–2019: REVERSED AND REMANDED.

---

**26.** We reject Komie's argument that as a matter of law he committed no act of contempt under this standard. Whether Komie wilfully violated a clear and specific court order is a question we leave for consideration on remand.